**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0079n.06

No. 08-5819

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Feb 07, 2011**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| DEVELOPERS DIVERSIFIED OF TENNESSEE, INC., | ) ) ) | |
| Plaintiff Cross-Defendant-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| THE TOKIO MARINE & FIRE INSURANCE COMPANY, | ) ) ) | |
| Defendant Cross-Plaintiff-Appellant, | ) ) | |
| and | ) ) | |
| FORESIGHT SERVICES, INC., Successor in Interest to Foresight Consulting, Inc., and CHM ROOF CONSULTANTS, INC., | ) ) ) ) | |
| Third-Party Defendants. | ) ) ) | |

**BEFORE:  MOORE and WHITE, Circuit Judges, and OLIVER, District Judge.**[*]

WHITE, J., announced the judgment of the court and delivered an opinion in which MOORE, J., and OLIVER, D.J., concurred except as to Part III-4.  MOORE, J., delivered a separate opinion, in which OLIVER, D. J., joined, which constitutes the opinion of the court on the issue discussed in Part III-4.

_____

[*]The Honorable Solomon Oliver, Jr., District Judge for the Northern District of Ohio, sitting by designation.

No. 08-5819
*Developers Diversified v. Tokio Marine & Fire Ins. Co.*

**HELENE N. WHITE, Circuit Judge.** Defendant Tokio Marine & Fire Insurance Company (Tokio), appeals from the district court's grant of summary judgment to Plaintiff Developers Diversified of Tennessee, Inc. (DD), in this declaratory judgment action to determine liability for property damage resulting from a partial roof collapse over retail space leased by Sports Authority. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Sports Authority entered into a lease agreement in January 1998 with Hendon Investments (Hendon) to lease retail space in a Brentwood, Tennessee, yet-to-be-built shopping center. Hendon assigned the lease to Service Hendon Cool Springs Associates (Service Hendon). Service Hendon retained an architectural firm, Pieper, O'Brien, Herr Architects, Ltd. (Pieper), to design the shopping center, including Sports Authority's space. The Lease provided that Sports Authority's building would be designed and constructed in general accordance with prototypical drawings and specifications submitted by Sports Authority. Pieper submitted drawings and specifications, which Sports Authority approved. Sub-contractor Holland Roofing installed the roof.

Construction of the shopping center was completed, and Sports Authority occupied the leased premises in September 1998. Plaintiff DD entered into a purchase and sale agreement in July 1998 to acquire the shopping center from Service Hendon, although the transaction did not close until after construction was completed in April 2000. Pursuant to the agreement, Service Hendon assigned and DD assumed Sports Authority's lease. The "Assignment and Assumption of Leases" between DD and Service Hendon provided that DD "assumes and agrees to perform all of the terms, covenants,

obligations and conditions of the Lease . . . in respect of the period from and after the date of this Assignment." [Record on Appeal (ROA) 08 5819 Vol. 2, p. 1158.]

After acquiring the shopping center in April 2000, DD, through a property management company, retained Foresight Consulting, Inc., and CHM Roof Consultants to inspect the roof. Neither reported any problem or defect to DD.

Following a severe rain storm in May 2003, part of the roof over Sports Authority's store collapsed and merchandise was damaged. Sports Authority's insurer, Defendant Tokio, paid approximately $2 million for that loss and sought reimbursement from DD. DD then filed the instant declaratory judgment action. Tokio answered and counter-claimed, asserting that DD breached the Lease by failing to keep, maintain and repair the roof, gutters and downspouts, and that Tokio suffered a loss of $2,056,073 due to DD's acts, omissions, neglect and negligence.

The district court initially denied the parties' cross-motions for summary judgment. Subsequently, discovery revealed that DD had no role in the design or construction of the building or roof, and the parties again moved for summary judgment.

In its second summary judgment motion, Tokio's theories of liability were that DD had defaulted under the Lease and that the default caused the partial roof collapse. The Lease obligated the landlord to build in accordance with the specifications, and placed sole responsibility on the landlord to perform "all maintenance, replacement and repair to the roof." DD responded that it had not defaulted under the Lease as a matter of law because Tennessee law required notice of a defect and an opportunity to cure before liability could be imposed on a landlord, and that in any event, no action or inaction on its part caused the roof to collapse. Relying on *Marshalls of Nashville,*

*Tennessee, Inc. v. Harding Mall Assoc., Ltd.,* 799 S.W.2d 239 (Tenn. Ct. App. 1990), the district court held that a commercial lessor must have actual notice of defects for which it bears responsibility under the lease and a reasonable time to cure those defects before liability can be imposed, and granted summary judgment in DD's favor. The district court did not reach the causation issue.

Tokio moved to reopen and reargue the motions for summary judgment, asserting that the district court failed to recognize the separate and independent provisions of the Lease imposing duties on the landlord that were not present in *Marshalls*. The court declined to grant reconsideration.

## II. THE LEASE

The key provisions of the Lease are as follows:

6. <u>DRAWINGS AND SPECIFICATIONS.</u>

A. <u>Generally</u>. Tenant's Building and the Site Improvements shall be constructed by Landlord . . . in accordance with the Approved Drawings and Specifications . . . .

\* \* \*

F. <u>Construction of the Building and Site Improvements/Incorporation of Materials and Components from Tenant's Prototypical Store Drawings and Specifications.</u> Tenant's Prototypical Store Drawings and Specifications, the Approved Drawings and Specifications and the Approved Site Improvement Drawings and Specifications shall constitute a part of this Lease; provided however that Landlord shall construct Tenant's Building in accordance with the Approved Drawings and Specifications (or any revisions thereto approved pursuant to the provisions of Article 6.D hereof) and shall construct the Site Improvements in accordance with the Approved Site Improvement Drawings and Specifications (or any revisions approved pursuant to the provisions of Article 6.E hereof.) Notwithstanding the approval by Tenant of the Approved Drawings and Specifications or the Approved Site Improvement Drawings and Specifications, Landlord shall incorporate all of the materials and components specified in Tenant's

Prototypical Store Drawings and Specifications into the Approved Drawings and Specifications and the Approved Site Improvement Drawings and Specifications and to the extent such materials and components are not incorporated or replaced by a substitute written approval by Tenant in its sole and absolute discretion, Tenant shall receive a credit to be applied toward Tenant Requested Change Orders and if no such Tenant Requested Change Orders are received or if Tenant's credits are not offset by Tenant Requested Change Orders, then Landlord shall pay Tenant an amount equal to the credit within sixty (60) days of the Date of Occupancy. . . .

\* \* \*

12. LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS.

A.   Representations, Warranties and Covenants.   Landlord hereby represents, warrants and covenants as follows:

\* \* \*

(ii)   Prior to and as a condition of the Date of Delivery of Possession, Landlord shall have substantially completed and prior to and as a condition to the Date of Occupancy Landlord shall have completed Tenant's Building in accordance with the Approved Drawings and Specifications (and any modifications thereto requested and approved by Tenant in accordance with Article 6.D. hereof) and shall have delivered to Tenant a final Certificate of Occupancy for Tenant's Building and the Site Improvements . . . .

\* \* \*

14. REPAIRS AND MAINTENANCE

A.   Tenant's Building.   Tenant shall make and pay for all maintenance, replacement and repair necessary to keep Tenant's Building in a good state of repair and in tenantable condition except for the items set forth in Article 17 hereof (which are designated as Landlord's responsibility) and the following maintenance, replacement or repair which shall remain the Landlord's sole responsibility unless Tenant, its employees, contractors, agents or invitees, caused the need for such repair, in which event Tenant shall pay only its contributing factor if Landlord gives notice to Tenant of Landlord's reasonable allocation of the costs between Tenant and other parties to be named by Landlord in said notice, and Tenant reasonably agrees to such allocation.   Said notice shall also include the percentage allocation to each such contributing party for each item of repair.   In the event of a dispute between Landlord and Tenant with respect to said allocation, Landlord shall be entitled to pursue such remedies as are available under this Lease or at law.

> (i) all maintenance, replacement and repair to the roof, slab. . . , outer walls, interior walls (to the extent of structural maintenance, replacement and repair) and structural portions of the Building . . .

which shall be necessary to maintain the Building in a safe, dry and tenantable condition and in good order and repair . . .

* * *

(iv) all maintenance, replacement and repair due to the acts, omissions, neglect or negligence of Landlord, or any other owner, occupant or tenant in the Shopping Center and each of their employees, agents, or contractors;

* * *

(vii) the costs of correcting defects in or inadequacies of the initial design or construction of Tenant's Building, the Site Improvements or the Common Areas or repair and replacement of any of the original materials or equipment in Tenant's Building, the Site Improvements or the Common Areas required as a result of such defects or inadequacies;

* * *

Landlord shall use reasonable and good faith efforts to stage, sequence, and perform any repair, maintenance or replacements to the Building to minimize the disruption of and interference with Tenant's business and operations and upon commencement of such repair, maintenance or replacement shall be continuously prosecuted and all repairs, maintenance and replacements to the Building performed by or on behalf of the Landlord shall be performed in a good, workmanlike and lien free manner and in compliance with all applicable legal and governmental and quasi-governmental requirements. . . .

* * *

17. GOVERNMENTAL REGULATIONS. Tenant shall observe and comply with all requirements, rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting Tenant's Building, including the making of structural and non-structural alterations, insofar as they are due to Tenant's specific occupancy and not retail occupancy in general; provided, however, in the event such rules, orders and regulations shall . . . (b) require structural or non-structural changes which are not due to the specific use of the premises by Tenant and are due to the general retail nature of the use, then and in . . . such event[], the same shall be complied with by Landlord at its sole cost and expense. Tenant shall have the right, however, to contest, without cost to Landlord, the validity or application of any such rule, order or regulation required to be complied with by Tenant in accordance with the foregoing . . . .

* * *

39. SUCCESSORS AND ASSIGNS/COVENANTS RUN WITH THE LAND. The conditions, covenants and agreements contained in this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors,

administrators, successors, assigns and subtenants. All covenants and agreements of this Lease shall run with the land described in Exhibit "A."

**III.**

This court reviews *de novo* the district court's grant of summary judgment to DD, *Helms v. Zubaty*, 495 F.3d 252, 255 (6th Cir. 2007), as well as the district court's interpretation of the Lease, *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 990 (6th Cir. 2007). Where the parties have filed cross-motions for summary judgment, the court "must evaluate each motion on its own merit and draw inferences against the party whose motion is being considered." *In re Markowitz*, 190 F.3d 455, 463 n.6 (6th Cir. 1999).

Because this is a diversity action, Tennessee law applies. *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Maryland*, 5 F.3d 982, 984 (6th Cir. 2005). Under Tennessee law, our role in resolving disputes regarding interpretation of a contract is to ascertain the intention of the parties based on the usual, natural, and ordinary meaning of the language used. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). "If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute." *Id.*

Tokio argues on appeal that DD defaulted under the terms of its Lease when DD 1) failed to maintain and repair the tenant's roof, as required by Lease ¶ 14(A)(i); 2) failed to remediate construction defects as required by Lease ¶ 14(A)(vii); 3) failed to ensure that all maintenance performed was performed in a good, workmanlike manner, as mandated by Lease ¶ 14(A); 4) refused to assume responsibility for its roof inspectors' negligence, as required by Lease ¶ 14(A)(iv); and 5) failed to comply with government regulations mandated by maintaining the building in Code-violative state, contrary to Lease ¶¶ 17 and 14. Finally, Tokio asserts that DD is liable for the failure

to construct the tenant's building in accordance with the agreed-to Lease specifications as required by Lease ¶¶ 6(F) and 12(A)(ii).

DD responds that it could not have defaulted under any of the above-mentioned Lease provisions as a matter of law because Tennessee law requires that Tokio provide DD notice of any defects in the building and an opportunity to cure those defects before DD can be liable for any default. DD further asserts that it cannot be held liable for the defaults of Service Hendon, the Lease assignor, and that, even assuming default, Tokio has failed to show causation. Neither party disputes that this is a breach-of-contract case and that the language of the Lease governs.

### 1- Duty to Maintain and Repair Roof Under Lease ¶ 14A(i)

Turning to the first claim, the relevant Lease provision provides that DD, as the landlord, assumes "sole responsibility" for "all maintenance, replacement and repair to the roof . . . which shall be necessary to maintain the Building in a safe, dry and tenantable condition and in good order and repair." ¶ 14A(i). The district court determined that all of Tokio's claims were foreclosed by *Marshalls*, 799 S.W. 2d 239, because Tokio had failed to present sufficient evidence to show that DD had actual notice of a roof defect.

### A - THE *MARSHALLS* DECISION

In *Marshalls*, 799 S.W.2d at 240, the Tennessee Court of Appeals affirmed the lower court's dismissal of the plaintiff's complaint following a bench trial, but on grounds different than those found by the trial court.

The plaintiff lessor, Marshalls, experienced roof leaks soon after becoming Harding's tenant, and the leaks continued over two years. Harding performed repairs and installed a system of channels between the roof and suspended ceiling in order to catch the water as it leaked through the roof. Marshalls brought suit for damages to its premises and merchandise, and Harding counterclaimed. Marshalls also filed a supplemental complaint alleging it had suffered additional damages from continuing roof leaks. The parties executed a mutual release (MRA) on June 18, 1986, which stated that the parties agreed to release each other from any and all claims, liabilities and causes of action alleged by either party in the plaintiff's original action, and that the parties would share the cost of replacing the roof according to an agreed-upon procedure.

Harding recommended a roofing contractor, Boyanton, to Marshalls, whom Marshalls approved. Harding then entered into a contract with Boyanton to replace the roof. Marshalls employed Downs to monitor Boyanton's work, and Boyanton began replacement of the roof on June 23, 1986. Downs visited the site that day and discovered that Boyanton was not installing the new roof in a workmanlike manner or in accordance with standard roofing practices. That night, during a rainstorm, water entered Marshall's store through the portion of the roof on which Boyanton had been working.

Marshalls filed a second supplemental complaint for damages sustained as a result of the June 23 incident. The parties entered into a second mutual release, which preserved the causes of action in Marshall's second supplemental complaint.

Following a bench trial, the chancellor found in Harding's favor, concluding that Boyanton's roofing work was performed pursuant to the MRA, *not* pursuant to the lease, and that the MRA released Harding from liability. 799 S.W.2d at 242. The chancellor noted that the MRA provided that the roofing work be done by an independent contractor, that there was no evidence of negligence on Harding's part in selecting the roofer, and that the roofer was an independent contractor who performed the work pursuant to the MRA. *Id.*

Marshalls appealed, asserting that the chancellor erred in dismissing its tort claims of negligent misrepresentation, negligence in selecting an incompetent independent contractor, and vicarious liability on the basis that the independent contractor's work was inherently dangerous. Marshalls also argued that Harding breached the lease agreement by failing to maintain the roof as required by the "Article 4 Repairs" provision, thereby interfering with Marshalls' quiet enjoyment, in violation of Article 16 of the lease. Harding maintained that the release agreement modified the lease, and abrogated Articles 4 and 16 of the lease. 799 S.W.2d at 244.

The Tennessee Court of Appeals rejected the chancellor's analysis,[1] but nevertheless affirmed

on the basis that Harding was not liable under the lease in the absence of notice of the defect and an

opportunity to cure:

> In contending that Defendant breached the "Repairs" provision of its lease with Plaintiff, Plaintiff relies on the specific language to the effect that "[l]andlord, at its own cost and expense, shall . . . *keep in good order* and repair . . . the roof." [emphasis ours] We find this contention to be without merit. A breach of a lease provision such as this is committed only after a tenant notifies its landlord that a portion of the leased premises is in need of repair, and the landlord timely fails to respond and bring about such repairs. This is not the factual situation before us. Here the damage resulted to Plaintiff's property at a time when Defendant, through an independent contractor, was attempting to bring about repairs to the roof.

799 S.W.2d at 245.

---

[1]The Tennessee Court of Appeals explained:

> In concluding that Defendant was not liable for breach of the lease, the trial court reasoned that the repairs being carried out by Boyanton were performed pursuant to the MRA, which released Defendant from any liability under the lease. We respectfully disagree with the trial court's finding that the MRA released Defendant from any liability under the lease. However, we concur with the trial court's finding that Defendant was not in breach of the lease. Even if the trial court reaches the right result on the wrong grounds, the appellate court can affirm the trial court's judgment.

> Prior to the MRA's execution, Plaintiff contended that Defendant was obligated to repair the roof because "Article 4 Repairs" provided that "[l]andlord, at its own cost and expense, shall . . . keep in good order and repair . . . the roof." On the other hand, Defendant contended that Plaintiff was responsible for the leaks in the roof because of its negligent installation of two roof-top air conditioning units. The MRA merely settled the dispute between the parties as to who was liable for the roof repairs, providing, among other things, that the cost of repairing the roof would be shared by Defendant and Plaintiff in a sixty/forty ratio. It did not modify, supersede, or abrogate the lease provisions.

799 S.W.2d at 244-45 (citations omitted).

The district court in the instant case found *Marshalls* dispositive of Tokio's claims:

> The *Marshalls* Court construed the "Repairs" provision in the lease to implicitly require notice as a condition precedent. While the *Marshalls* Court cited no authority for this proposition, numerous cases from other jurisdictions are in accord with this principle, and one noted authority has stated:

>> It is a general rule that where possession of leased property passes to the lessee under a lease containing a covenant by the lessor to repair the leased premises, the latter cannot be held liable for a breach of this covenant without showing notice to or knowledge by him of the need for repairs; such notice or knowledge is an essential element of liability.

> Annot., Necessity of Notice to Landlord as Condition of Asserting Breach of Express Covenant to Repair, 28 ALR 1525 (citing cases).

> * * *

> Tokio further argues that, under Williston on Contracts, notice is not required if the landlord has the right to enter the property, or where the landlord covenants to repair before the beginning of the tenancy. *Marshalls*, however, does not recognize these propositions. If these factors had been relevant, however, surely the *Marshalls* Court would have discussed them.

> * * *

> [T]here is no factual dispute that Plaintiff did not have actual notice that the roof (or any part of the roof) needed to be repaired, maintained, or replaced. At most, Defendant raises a constructive notice argument, contending essentially that Plaintiff should have compared the original architectural drawings with the actual condition of the roof as built. The *Marshalls* Court, however, clearly required actual notice, not constructive notice.

> All of Tokio's arguments essentially boil down to the proposition that Developers should have known and corrected the deviations from the design of the roof and/or the roofing system before the roof collapsed. Tokio would impose these obligations upon Developers in spite of the facts that: (1) SA's Building was substantially completed in 1998, and SA took possession on September 24, 1988 [sic 1998], while Developers did not acquire the property until April 2000; (2) Neither SA nor anyone else raised any complaints that the building had not been built as designed; (3) On November 3, 1998, Brentwood city authorities approved the building for occupancy confirming that it was in compliance with Code requirements; and (4) Developers regularly had the roof inspected.

In the case at bar, Plaintiff had no notice of any defective condition and no opportunity to correct any alleged deficiencies within a reasonable time period. Thus, applying the holding in *Marshalls* to the case at bar, the Court concludes that Plaintiff did not breach any of the Lease provisions argued by Tokio.

In rejecting Tokio's arguments in favor of reconsideration, which asked the court to focus on the asserted separate and independent defaults under the lease, the district court reiterated its conclusion that *Marshalls* forecloses Tokio's other arguments based on the lease:

> Even if the alleged breaches were separate and independent, the holding of *Marshalls* forecloses Tokio's other arguments. Under *Marshalls*, Developers was entitled to notice that a portion of the leased premises was in need of repair, and it was entitled to a reasonable time after that notice was given to respond and bring about such repairs. 799 S.W.2d at 245. [ROA 249, p. 7.]

**B**

As noted by the district court, *Marshalls'* articulation of the notice requirement is without citation to precedent or other authority. As the treatises below demonstrate, however, some notice requirement is widely recognized and applied, including in modern-day cases. *See* Cause of Action Against Lessor for Failure to Repair or Maintain Leased Commercial Premises, 4 Causes of Action 2d 785 (2008):

> PRIMA FACIE CASE
> To establish a prima facie case in an action against a lessor for failure to repair or maintain leased commercial premises, the plaintiff must plead and prove the defendant's duty or obligation, under the lease agreement or otherwise, to make the repairs at issue.
>
> To establish that the lessor's obligation to make repairs or maintain the premises has accrued, the plaintiff usually must prove (1) the present need for the repairs and (2) the lessee's notice to the lessor of the need for repairs.

*See also* 49 Am. Jur.2d, Landlord and Tenant § 463:

Generally, unless it appears that the landlord knows of the need to repair the leased premises, the tenant must notify the landlord of such need in order to place the landlord in default for failure to repair . . . . No notice of a need for repairs is necessary where the landlord has a duty to inspect the premises.

* * *

Liability imposed upon a landlord for failure to repair the leased premises arises only in instances where there is a duty to repair and notice has been given of the defect. *Gainey v. Smacky's Investments, Inc.*, 287 Ga. App. 529, 652 S.E.2d 167 (2007). [Footnote omitted.]

*See also* C.J.S. Landlord & Tenant § 838:

In order to sustain an action for damages caused by a breach of covenant to repair, previous demand on the covenantor that he or she make the repairs has been held necessary [citing *Hartz v. Stauffer*, 163 La. 382, 111 So. 794 (1927)]. Other decisions have held that demand is not essential, at least in some circumstances [citing *Arnold v. Ryan*, 24 A.D.2d 943, 265 N.Y.S.2d 300 (1st Dep't 1965)], and that it is only necessary for the tenant to give the landlord notice of the defective condition of the property [citing *Ash v. Meeks*, 134 A.D. 154, 118 N.Y.S. 821 (2d Dep't 1909)]. . . .

*But see id.* § 836:

Where a landlord is obligated to make repairs during the term, actual or constructive notice of the need for repair is necessary to put the landlord in default on such obligation, unless he or she agreed to repair without notice, or has actual knowledge, or reasonable opportunity to acquire knowledge, of the defect.

In order to put the landlord in default for breach of his or her covenants at the beginning of the tenancy to put the premises in repair, no notice is necessary; but, where the duty is imposed on the landlord by statute or otherwise to make repairs during the term, the general rule is that due notice by the tenant to make such repairs is requisite to put the landlord in default [citing *Morris v. Oney*, 217 Cal. App.2d 864 (2d Dist. 1963); *Richards v. Dodge*, 150 So.2d 477 (Fla. Dist. Ct. App. 2d Dist. 1963); *Wolff v. Mauceli*, 237 Miss. 378, 114 So. 2d 845 (1959), corrected 237 Miss. 378, 117 So. 2d 332 (1960); *Conner v. Farmers and Merchants Bank*, 243 S.C. 132, 132 S.E.2d 385 (1963); *Marrion v. Anderson*, 36 Wash. 2d 353, 218 P.2d 320 (1950)]. . . .

These authorities are in general in keeping with the notice requirement as stated in *Marshalls*.

Tokio challenges the district court's application of *Marshalls* on several bases, arguing that the proposition on which the district court relied is *dicta*, that the common-law rule enunciated in *Marshalls* is inapplicable because it is contrary to the express intention of the parties manifest on the face of the Lease, and that *Marshalls* is further inapposite under the circumstance that DD, as assignee of former owner Service-Hendon, assumed the landlord's obligations under the Lease and is thus subject to liability for the failure to deliver to SA a Lease-conforming structure, i.e., one in accord with the Approved Drawings & Specifications. Tokio maintains that the Lease's plain terms evidence that the parties "contemplated continuous oversight by the landlord for the upkeep of the roof."

While we do not read the *Marshalls* court's statement of the notice requirement as mere *dicta*, it is plain on the face of the decision that the decision does not purport to address whether constructive, rather than actual, notice to the landlord is adequate. Tokio's observation that the *Marshalls* court focused on the fact that the damage was caused while the landlord was attempting to fix the roof is apt. On the other hand, *Marshalls* does support that a standard lease provision requiring the landlord to keep the roof in good order and repair does not render the landlord strictly liable for all damages caused by a roof leak in the absence of some sort of notice and failure to timely cure. Otherwise, there would have been no need for the court to address issues other than whether the leak was due to Harding's lack of maintenance or Marshalls' installation of the air conditioning units.

More important here is that there is no reason to read *Marshalls* as in any way holding or implying that the general common-law rule (requiring some sort of notice and a failure to cure before finding a breach of a landlord's commonly assumed undertaking to keep the roof in good repair) abrogates the paramount rule of contract interpretation requiring the court to ascertain the intention of the parties based on the usual, natural, and ordinary meaning of the language used. *See Allstate, supra. Marshalls* simply reiterated the general common-law rule requiring notice of a breach of the covenant to keep the premises in repair; it did not hold that express provisions in the parties' contract imposing different or additional obligations should be ignored.

The instant Lease contains express provisions requiring the landlord to build the building in accordance with the drawings and specifications and incorporating the drawings and specifications as part of the Lease. ¶¶ 6A, 6F. Further, under the Lease, the landlord represents, warrants and covenants that as of the Date of Occupancy, the landlord completed the building in accordance with the approved drawings and specifications. ¶ 12A(ii). The Lease provides that its conditions, covenants and agreements are binding on the parties' assignees and run with the land. ¶ 39.

The district court erred in interpreting *Marshalls* as precluding Tokio's claims under the Lease. *Marshalls* does not address whether actual notice is required at common law, and it leaves unanswered the question whether constructive notice suffices. In fact, DD concedes as much on appeal by acknowledging that "Tennessee courts have uniformly held that a landlord is only liable for damages . . . if the landlord knew of the defective condition or *should have known* of it by the

exercise of ordinary care." Pl.'s Br. at 24. The district court's conclusion that Tokio was required to show actual notice under *Marshalls* was erroneous.

Moreover, as Tokio highlights, the Lease here expressly allocated the entirety of roof repair, maintenance, and replacement to DD – it was DD's "sole responsibility" under the Lease. ¶ 14A(i). This provision is unlike the general good-repair provision at issue in *Marshalls*. *See Marshalls*, 799 S.W.2d at 245 (requiring landlord to "*keep* [the roof] *in good order* and repair"). If Tokio were required to provide actual notice to DD that there was a problem with the roof before DD could be held liable for a default on its obligations, then DD's "sole" assumption of the duty to maintain the roof would be meaningless. *See e.g., Landmark HHH, LLC v. Gi Hwa Park*, 671 S.E.2d 143, 146 (Va. 2009) ("The . . . requirement that [the landlord] 'make such repairs . . . as are necessary following [the landlord's] knowledge of the necessity of said repairs' is not a limitation on the principal duty to provide a serviceable, leak-free roof. The duty to keep the roof in good repair would be effectively negated if necessary repairs to the roof were only required when Landmark was notified by a tenant of defects in the roof." (quoting the lease provision)).

*Marshalls'* common-law notice requirement does not apply where it conflicts with the express terms of the parties' contract. The specific language of the Lease at issue here modifies any applicable common-law rule. We therefore remand to the district court for it to decide in the first instance whether DD had constructive knowledge of the defect in the roof such that it can be held liable for breach of Lease ¶ 14A(i). We express no opinion as to causation, and leave that question to the district court on remand.

## 2 - **Additional Independent Basis for Finding Defaults Under Lease ¶ 14**

Tokio's second, third and fourth arguments on appeal are that DD breached a number of additional Lease provisions and that because each provision is separately enforceable and does not depend on the district court's reading of *Marshalls*, the district court erred in dismissing Tokio's claims without specifically analyzing those claims. We agree with Tokio that the district court erred in failing to consider its arguments related to DD's potential breaches of Lease ¶¶14(A)(vii) ; 14(A) subparagraph 5; and 14(A)(iv). The Lease provides that ". . . each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law." ¶ 36.

Moreover, to the extent that *Marshalls* bears on the resolution of these independent breaches, the district court should read *Marshalls* as imposing only a constructive notice requirement. We remand for the district court to consider Tokio's arguments in the first instance. *See City of Mount Clemens v. EPA*, 917 F.2d 908, 916 n.7 (6th Cir. 1990) (remanding to the district court and declining to opine on the merits of several issues where the arguments were not addressed by the district court and additional fact-finding would be required to resolve those issues (citing *Dandridge v. Williams*, 397 U.S. 471, 476 n.6 (1970)). We express no opinion as to the merits of these claims or on issues of causation, and leave those questions to the district court on remand.

## 3- **Duty to Comply with Governmental Regulations Under Lease ¶¶ 14 and 17**

Tokio's fifth argument is that the district court failed to consider its claim that DD defaulted on Lease ¶ 14(A), which required DD to perform all maintenance "in compliance with all applicable legal and governmental and quasi-governmental requirements." Similarly, Tokio contends that the

district court misread Lease ¶ 17 as applying only to tenants and that DD, as the landlord, also had a duty to "observe and comply with all requirements, rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting Tenant's Building. Lease ¶ 17.

We agree with Tokio that the district court erred in interpreting Lease ¶ 17 as binding only on the Lease tenant. The provision indicates that DD, as the landlord, is also bound to "comply with all requirements, rules, orders and regulations . . . in the event [that] such rules, orders and regulations . . . require structural or non-structural changes . . . due to the general retail nature of the use." *Id.* Because the district court is in the best position to determine in the first instance whether DD has breached this provision on the instant facts, we remand this claim. We also remand Tokio's claim under Lease ¶ 14A, which the district court did not consider, for it to decide it in the first instance. *See City of Mount Clemens*, 917 F.2d at 916 n.7.

### 4 - Liability for Default on Lease ¶¶ 6(F) and 12(A)(ii)

Tokio's final argument is that DD is liable under Tennessee law for the failure to construct the tenant's building in accordance with particular specifications. Lease ¶¶ 6(F), 12(A)(ii). DD disputes that the assignment of the Lease made it "a guarantor of the original design and construction decisions and [claims that] no [Lease] provision required it to re-visit the original construction decisions by building professionals." Pl.'s Br. at 20-21.

In Tennessee, a court's interpretation of a lease is "governed by the general rules of contract construction." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn.

2002). "If the language of a written instrument is clear and unambiguous, the court must interpret it as written." *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526, 530 (Tenn. Ct. App. 1981). Contractual terms must be afforded "their natural and ordinary meaning," should be construed "in the context of the entire contract," and "courts should . . . avoid strained constructions that create ambiguities where none exist." *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 597 (Tenn. Ct. App. 1999).

The Lease states in relevant part: "Landlord shall construct Tenant's Building in accordance with the Approved Drawings and Specifications," ¶ 6(F), and "prior to and as a condition to the Date of Occupancy[,] Landlord shall have completed Tenant's Building in accordance with the Approved Drawings and Specifications," ¶ 12(A)(ii). DD "assume[d] and agree[d] to perform all of the terms, covenants, obligations and conditions of the Lease[] which are required to be performed or complied with by lessor under the Lease[], in respect of the period from and after the date of th[e] Assignment." ROA at 289 (Assignment Agreement). The Lease also provided that "[t]he conditions, covenants and agreements contained in th[e] Lease shall be binding upon and inure to the benefit of the parties hereto and their respective . . . successors [and] assigns," and that "[a]ll covenants and agreements of th[e] Lease shall run with the land." ¶ 39.

Tokio is correct that, as a general matter, all of Service Hendon's obligations under the Lease were transferred to DD on Service Hendon's assignment of the Lease. ¶ 39; *see also Griswold v. Income Props. II*, No. 01A01-9310-CH-00469, 1995 WL 256756, at *4 (Tenn. Ct. App. May 4, 1995) (unpublished opinion) ("The [landlord's] assignee is directly liable to the [tenant] for the

obligations that run with the transferred interest." (citing *Hailey v. Cunningham*, 654 S.W.2d 392, 396 (Tenn. 1983), and the Restatement (Second) of Property § 16.2 (1976), among other sources)).

Following the assignment, DD and Sports Authority were in privity of estate. *First Am. Nat. Bank v. Chicken Sys. of Am., Inc*. 510 S.W.2d 906, 908 (Tenn. 1974) ("[T]here is privity of estate between an original [tenant] and a subsequent [landlord] assignee."); *see also* Restatement (Second) of Property, Landlord and Tenant, § 16.1 cmt. e (1976) ("If the transferor is the landlord, the transferee comes into privity of estate with the other party to the lease . . .").

Section 16.1 of the Restatement (Second) of Property (1976), is concerned with the transfer of promises running with the land. Subsection (2) provides that "A transferee of an interest in leased property is obligated to perform an express promise contained in the lease if the promise creates a burden that touches and concerns the transferred interest," the parties intend that the burden is to run with the land, and "the transfer brings the transferee into privity of estate with the person entitled to enforce the promise," who does not release the transferee of the obligation. Restatement (Second) of Property § 16.1(2). Subsection (3) provides that "[t]he transferee will not be liable for any breach of the promise which occurred before the transfer to him." *Id.* § 16.1(3). Although the black letter does not elaborate concerning the liability of the transferee for a breach of promise occurring after the transfer, the reporter's Commentary does:

> h. *Liability of the transferee if promise broken before the transfer.*
> A transferee is liable on a promise that runs with the transferred interest only to the extent of a breach of the promise that occurs while the transferee is in privity of estate with the person entitled to enforce the promise. If the promise is capable of being broken only once and was broken before the transfer, the transferee does not incur any

personal liability with respect to it. If the promise is capable of successive independent breaches, the breaches that occur before the transfer cannot subject the transferee to any personal liability. . . .

. . . .

*A promise may be of such a nature that it may be broken before a transfer and broken again after the transfer by the failure of the transferee, after a reasonable period of time, to cure the default of the transferor. This would be the case if the failure to act on the part of the transferor, or if the conduct of the transferor, constitutes a continuous breach of the promise until it is corrected.* [Emphasis added.]

The following example is provided to illustrate application of the Commentary:

30. L leases residential property to T and L promises to keep the leased property in a condition that meets the housing code safety and health standards. L has failed to perform this obligation and at the time he assigns his reversion to L1, the leased property does not meet the housing code standards. Though L is in default at the time of the transfer, L1 will also be in default, after a reasonable time, if he does not perform. The cost to L1 of performance can be recovered by him from L so far as such costs relate to the condition of the leased property at the time of the assignment to L of the reversion. L1 is subrogated to the rights which the other party to the lease had against L at the time of L's assignment to L1.

Restatement, § 16.1 cmt. h.

Because three years intervened between the transfer of the lease to DD and the rain storm, and there is no express requirement of notice, I conclude that a reasonable period of time elapsed as a matter of law.

The question then is whether the promise that the "Landlord shall construct Tenant's Building in accordance with the Approved Drawings and Specifications," ¶ 6(F), is a promise "of such a nature that it may be broken before a transfer and broken again after the transfer by the failure

of the transferee, after a reasonable period of time, to cure the default of the transferor." Restatement (Second) of Prop.; Landlord and Tenant § 16.1 cmt. h (1976). This is where I part company with my colleagues.

My colleagues conclude that "Service Hendon's failure to construct the building pursuant to the agreed-to specifications occurred prior to [the Lease assignment], and Service Hendon's failure to do so was a breach of the Lease that could occur only once." I agree that DD cannot be held liable for the pre-assignment breach. However, I do not agree that the promise to build in accordance with the plans was capable of being broken only once.

A covenant running with the land is ordinarily a covenant capable of successive independent breaches. Although performance of a promise running with the land may be due before its breach or when breached by nonperformance, the breach does not cause the promise to "expire" or the promise ordinarily to become one "capable of being broken only once" if the promise can still be performed by the landlord or a successor landlord beyond the time when it should have been performed. A broken promise does not expire and ordinarily can be performed by a successor landlord, unless the promise sets a definite fixed date for performance, and the promise is of such a nature that it cannot be performed subsequently. A promise that is of such a nature that it is incapable of being performed after a definite set date for its performance is the kind of promise running with the land capable of being broken only once. But a promise that can be performed by a successor landlord is not a promise capable of being broken only once. The promise in the instant lease to build the roof in accordance with the plans and specifications is clearly a promise that could

- 23 -

have been performed at any time after the transfer of the Lease by Service Hendon to DD, and therefore, even though breached before the transfer, is not a promise capable of being breached only once.

My colleagues find support in *Regency Advantage Ltd. v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275 (Tex. 1996), cited in the Restatement. In *Regency Advantage*, the Supreme Court of Texas concluded that a promise to "build out" premises within 45 days of notice of the tenant's approval to operate a bingo game could only be broken once, and vacated a trial-court judgment against the transferee for failure to build out within 45 days. The promise in *Recency Advantage*, however, had a temporal element; the work was to be done within 45 days, and 45 days had passed and apparently could not be revived.

By contrast, in the instant case, Service Hendon did not agree to complete the building by a date certain. Rather, it agreed in paragraph 6F to construct the building in accordance with the plans and specifications without specifying a date for completion. Service Hendon was not subject to suit for delay in completing construction.[2] Absent a date certain for completion, the promise in paragraph 6F of the lease to build in accordance with plans and specifications is not a promise capable of being broken only once. It is a promise that could have been honored and performed at

---

[2]In lieu of a provision in paragraph 6F or Paragraph 12A(ii) or elsewhere in the Lease providing a promised date certain for completion of construction, Paragraph 11B provides that if the building has not been substantially completed prior to September 28, 1998, the tenant shall have the option of terminating the Lease, in which event the landlord shall pay the tenant a Termination Fee of $100,000, or, as set forth in paragraph 11C, the tenant may accept late delivery and receive the $100,000 as liquidated damages for late delivery. These provisions do not purport to provide that the tenant waives all claims based on a failure to delivery the premises as warranted.

any time prior to the loss, including during the three years between DD's assumption of the lease and the loss.[3]

Nor am I persuaded that paragraph 12A(ii)'s representation, warranty and covenant that "prior to and as a condition to the Date of Occupancy Landlord shall have completed Tenant's Building in accordance with the Approved Drawings and Specifications . . ." renders paragraph 6F's promise to build in accordance with the Approved Drawings and Specifications capable of being breached only once. Unlike my colleagues, I do not view this language as converting a promise without a date (and therefore capable of ongoing breach) into one that came due by a particular date prior to the tenants occupancy, and which, once breached, was not capable of being again breached when not cured.

The Date of Occupancy adverted to in Paragraph 12A(ii) is not a promised date certain for completion of construction in accordance with plans and specifications. It is rather, as specifically ser forth in the Lease, the date, after completion of construction, no less than 60 days following

---

[3] My colleagues also cite *Plaza Inv. Co. v. Abel,* 153 N.W.2d 379, 383 (Mich Ct. App. 1967) and *Katherine R. Napleton Revocable Self-Declaration of Trust v. Vatterott Educ. Ctrs., Inc.,* 745 N.W.2d 325, 329 (Neb. 2008). I find these cases distinguishable as well. In *Plaza Inv. Co.*, the loss to the merchandise due to the faulty roof occurred before assumption of the lease. The Michigan Court of Appeals held that the tenant could not deduct the value of merchandise damaged while the first landlord owned the premises from the rent owed to the second landlord, which accrued after the loss and transfer. *Napleton Trust* held that an assignee tenant was not responsible for property tax liabilities that arose prior to the tenant's assuming the lease. In the former case, the damage occurred prior to the assumption of the lease; here the damage occurred while the transferee landlord had control of the premises. In the latter case, the taxes became due and owing at a fixed time prior to the assignment, and the language of the assignment did not impose liability on the assignee. Here, the obligation to build in accordance with the plans and specifications, unlike the obligation to pay property taxes, was continuing until performed.

substantial completion of construction and delivery of possession of the premises to the tenant, that

the term of the lease begins and the tenant becomes obligated to begin paying rent.[4]

Treating the date that the tenant accepts possession or occupancy of the newly constructed

building as a promised date-certain for satisfying all promises relating to construction would mean

that almost all unperformed and breached promises would, although running with the land, become

covenants capable of being broken but once, thereby eliminating their efficacy as to defects

discovered after transfer of the property, regardless of when harm occurs, and rendering their running

with the land of no import. The right to sue the original landlord for such breaches may provide no

real remedy. I see no reason to deem such open-ended promises covenants capable of being

breached only once, thereby immunizing the assignee-landlord from the obligation to cure defaults

of the transferor landlord, including the obligation to provide a building according to the lease,

notwithstanding the tenant's payment of rent to the assignee-landlord. The promise to build in

accordance with plans and specifications is similar to the promise in the Restatement's Commentary

to keep a building in accordance with housing code safety and health standards. Restatement, § 16.1

cmt. h. Both require scrutiny of the structure for latent and patent defects, and scrutiny of plans and

specifications in one case and housing code safety and health standards in another. The nature of

---

[4]Paragraph 11A of the Lease provides that the "Date of Occupancy" shall be the earlier of "(a) the date upon which Tenant shall open its store for business, provided that all requirements of the Date of Delivery of Possession and the Date of Occupancy have been satisfied . . . Or (b) the date which shall be 60 days . . . . After the Date of Delivery of Possession." "The 'Date of Delivery of Possession' shall be deemed to have occurred on the date" that the landlord delivers possession of the substantially complete premises to the tenant broom clean, and delivers to the tenant architect of engineer certificates of completion.

the breach is similar in that it is capable of "successive independent" "continuous" breaches until the default is cured by the transferee, who is in privity of estate when the successive independent breach continues.

By accepting the transfer of obligations under the lease that runs with the transferred interest, the transferee is deemed as a matter of law to have assumed performance of the transferor's promises, including the promise to complete the building in accordance with the plans and specifications. If the building was not completed in accordance with the plans and specifications, the transferee's failure to cure the defect in accordance with the transferee's assumption of the promise to so complete it constitutes a successive independent continuous breach, subjecting the transferee to liability.

The terms and provisions of the Assignment of Leases, seeking to provide limitations on DD's liability for failure of performance by Service Hendon, concern only the rights and obligations owing by them to each other, and does not concern failures of performance by DD itself of covenants running with the land. Nothing in the Assignment of Leases can modify DD's obligations as successor landlord under the Lease to the Tenant, arising pursuant to law in respect to covenants in the Lease running with the land. As set forth in Illustration 30 to §16.1 of the Restatement, DD is entitled to be indemnified by Service Hendon.

I would reverse and remand as to this claim as well.

**IV**

Accordingly, we AFFIRM the district court's order granting DD summary judgment as to Tokio's claim that DD is liable for failure to construct the building in accordance with Lease ¶¶ 6(F) and 12(A)(ii).  We REVERSE and REMAND for the district court to address the issues whether DD 1) failed to maintain and repair the roof, as required by Lease ¶ 14(A)(i); 2) failed to remediate construction defects as required by Lease ¶ 14(A)(vii); 3) failed to ensure that all maintenance performed was performed in a good, workmanlike manner, as mandated by Lease ¶ 14(A), subparagraph 5; and 4) was required to assume responsibility for its roof inspectors' negligence, as required by Lease ¶ 14(A)(iv).

We also remand to the district court to decide in the first instance whether DD failed to comply with government regulations by maintaining the building in a Code-violative state, in contravention of Lease ¶¶ 17 and 14.

**KAREN NELSON MOORE, Circuit Judge, joined by Solomon Oliver, Jr., Chief District Judge, concurring in part and constituting the majority opinion with respect to Part III-4.** We concur with the Judge White's conclusion that this case must be remanded to the district court and join her opinion except for its analysis regarding whether Developers Diversified ("Developers") should be held liable to Tokio Marine ("Tokio") for the failure of Developers' predecessor-in-interest, Service Hendon, to construct the tenant's building in accordance with the agreed-to Lease specifications prior to its occupancy, as required by Lease ¶¶ 6(F) and 12(A)(ii). Because this question does not hinge on additional facts and the parties briefed the issue adequately on appeal, we reach the merits of Tokio's claim and hold that Developers cannot be held liable for Service Hendon's failure to construct the building in accordance with the Lease's precise specifications because the default occurred prior to the transfer of the lease interest and was not capable of repetition during Developers' ownership.

The Lease provisions at issue read, in relevant part: "[The] Landlord shall construct Tenant's Building in accordance with the Approved Drawings and Specifications," App'x at 65 (Lease ¶ 6(F)), and "prior to and as a condition to the Date of Occupancy[,] Landlord shall have completed Tenant's Building in accordance with the Approved Drawings and Specifications," *id.* at 73 (Lease ¶ 12(A)(ii)). Although Developers did not design or construct the building, or even own the building at the time it was manufactured, when Service Hendon assigned the lease Developers "assume[d] and agree[d] to perform all of the terms, covenants, obligations and conditions of the Lease[] which are required to be performed or complied with by [the] lessor under the Lease[], in

respect of the period from and after the date of th[e] Assignment." Record on Appeal ("ROA") at 289 (Assignment Agreement). Finally, the Lease stated that "[t]he conditions, covenants and agreements contained in th[e] Lease shall be binding upon and inure to the benefit of the parties hereto and their respective . . . successors [and] assigns," and that "[a]ll covenants and agreements of th[e] Lease shall run with the land." App'x at 110 (Lease ¶ 39).

Although the language of Lease ¶ 6(F) and ¶ 12(A)(ii) plainly required Service Hendon to construct the tenant's building in compliance with the agreed-to specifications, the Lease also indicates that the obligation to do so came due at the time of the building's initial construction and "prior to" its occupancy. App'x at 73 (Lease ¶ 12(A)(ii)). It was at this point that the contract was breached, and neither party disputes that during the relevant period Developers was neither the owner of the building nor its lessor. Tokio correctly asserts that generally all of Service Hendon's obligations under the Lease were transferred to Developers upon Service Hendon's assignment of the Lease. *See* App'x at 110 (Lease ¶ 39); *see also Griswold v. Income Props. II*, No. 01A01-9310-CH-00469, 1995 WL 256756, at *4 (Tenn. Ct. App. May 4, 1995) (unpublished opinion) ("The [landlord's] assignee is directly liable to the [tenant] for the obligations that run with the transferred interest." (citing *Hailey v. Cunningham*, 654 S.W.2d 392, 396 (Tenn. 1983), and the Restatement (Second) of Property § 16.2 (1976), among other sources)). As a result, after the assignment, Developers and the original tenant were in privity of estate. *First Am. Nat. Bank v. Chicken Sys. of Am., Inc.* 510 S.W.2d 906, 908 (Tenn. 1974) ("[T]here is privity of estate between an original [tenant] and a subsequent [landlord] assignee."); *see also* Restatement (Second) of

Property § 16.1 cmt. e (1976) ("If the transferor is the landlord, the transferee comes into privity of estate with the other party to the lease . . .").

What is fatal to Tokio's claim is that the recipient of a transferred interest, such as a lease assignee, "is liable on a promise that runs with the transferred interest *only* to the extent of a breach of the promise that occurs *while* the transferee is in privity of estate with the person entitled to enforce the promise." Restatement (Second) of Property § 16.1 cmt. h (emphases added). "If the promise is capable of being broken only once, and was broken before the transfer, the transferee does not incur any personal liability with respect to it."[1] *Id.* In the instant case, although Developers and the tenant were in privity of estate from the date of the Lease assignment onward, Service Hendon's failure to construct the building pursuant to the agreed-to specifications occurred prior to that time, and Service Hendon's failure to do so was a breach of the Lease that could occur only once. Developers cannot be liable for Service Hendon's pre-assignment breach. *See Regency Advantage Ltd. P'ship v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275, 277 (Tex. 1996) ("The issue here is straightforward. Even assuming that [the landlord-assignor] breached the lease . . . [the assignee] did not breach the lease because the obligation to build out the premises accrued before the lease was assigned."); *Plaza Inv. Co. v. Abel*, 153 N.W.2d 379, 383 (Mich. Ct. App. 1967) ("We find no

---

[1]Although the Tennessee courts have never had the occasion to address the precise issue before the panel, based on the courts' reliance on the rules set forth in the Restatement (Second) of Property to resolve other cases involving leasehold interests and landlord-tenant relationships, *see, e.g.*, *Griswold*, 1995 WL 256756, at *4; *Cain P'ship Ltd. v. Pioneer Inv. Servs. Co.*, 914 S.W.2d 452, 459 (Tenn. 1996), we believe that Tennessee would find the position set forth in the Restatement persuasive.

authority holding a successor to the landlord's . . . interest liable for his predecessor's breach. When

the courts have found a successor liable they have predicated such finding on a determination that

the successor himself breached or repeated the existing breach of covenant."); *see also Katherine*

*R. Napleton Revocable Self-Declaration of Trust v. Vatterott Educ. Ctrs., Inc.*, 745 N.W.2d 325, 329

(Neb. 2008) ("It has generally been stated that an assignee . . . of an interest in leased property is

liable for a breach of a promise that runs with the land and which is broken while the assignee or

transferee holds the leasehold estate, but is not liable for a promise that runs with the land if the

promise is broken before the assignment or transfer." (surveying cases)).[2]

Tokio claims that Developers' privity of contract with the tenant via Developers'

assumption of the entirety of the Lease provides an independent basis for liability, but Tokio has put

forth no evidence that Developers promised to perform or be held liable for Service Hendon's pre-

assignment default of the specific contractual obligations under Lease ¶ 6(F) and ¶ 12(A)(ii). To the

contrary, the agreement governing the assignment of the Lease between Service Hendon and

---

[2]We express no opinion on whether Tokio's claim that Developers can be held liable for Service Hendon's alleged pre-assignment breach of any other Lease provisions has merit. That question is properly left to the district court at this juncture. We note, however, that the other Lease provisions at issue are not clearly of the character as Lease ¶ 6(F) and ¶ 12(A)(ii), which are able to be breached only once. *See, e.g.*, *Abel*, 153 N.W.2d at 383 ("A covenant to keep in repair throughout the term of the lease is capable of constant or continuous breach . . ."). The fact that the other Lease provisions may impose a continuing obligation upon Developers may explain Developers and Service Hendon's inclusion of an indemnity clause within their assignment contract that limits Developers' liability to post-purchase breaches. For that reason, Tokio's argument the indemnity clause would be meaningless if Developers were not held liable for the original construction defects is not convincing. *See* Appellant Br. at 39 ("If [Developers'] liability was limited to post-purchase breaches then it would have had no reason to have bargained for the inclusion of this indemnification provision."). It would likely be applicable to those provisions capable of repetitive breach.

Developers states that Developers assumed only those obligations "from and after the date of th[e] Assignment." *See* ROA at 289 (Assignment Agreement). This language, afforded its natural meaning, indicates that Developers intended to assume only those obligations running "from and after the date" that Service Hendon assigned Developers the Lease. *Id.* We do not believe that this provision can be interpreted as evidencing Developers' intent to assume, on the date of purchase, the entirety of the obligations and liabilities that Service Hendon had theretofore accrued. Tokio's assertion that "from and after" the assignment date "simply defines the date on which rights and liabilities under the several agreements shifted from Service Hendon" to Developers, "namely on the date of the Agreement," Appellant Br. at 38, is a strained reading of the language, and we believe it unpersuasive.[3]

Our disagreement with Judge White concerns whether the failure to construct the building in accordance with the specifications set forth in the Lease prior to and as a condition of the tenant's occupancy is a promise that is capable of being broken only once or whether it is capable of successive independent breaches such that Developers Diversified can be held liable. Although we respect Judge White's conclusion that the "promise that the building [be] completed in

---

[3]Tokio argues that Developers could not "unilaterally delimit[] its liability to post-purchase breaches" to the detriment of the tenant under Tennessee law without a novation. Appellant Reply Br. at 21. But Tokio confuses the issue. Although Developers is not liable for Service Hendon's pre-assignment breach, that does not mean that Service Hendon cannot be held liable for its original breach. Tokio may have an existing remedy against Service Hendon as the original lessor with whom it has privity of contract, so Tokio's rights have not been limited by the agreement between Service Hendon and Developers.

accordance with plans and specifications" was capable of successive independent breach, we remain convinced that summary judgment in favor of Developers Diversified was proper on this claim.

First, we do not believe that *Regency Advantage Ltd. Partnership v. Bingo Idea-Watauga, Inc.*, 936 S.W.2d 275 (Tex. 1996), is distinguishable from the instant case in any meaningful manner. In *Regency*, the Supreme Court of Texas held that a landlord's promise to "build out" a leased premise within forty-five days of receiving a tenant's notification regarding permitting was capable of being breached but once and that "because the obligation to build out the premises accrued before the lease was assigned" to a successor in interest, that successor could not be held liable for the breach. *Regency*, 936 S.W.2d at 277. In essence, the original landlord in *Regency* was required to complete a particular task by a particular date, which it did not do. Similarly, in the instant case, "prior to and as a condition to the Date of Occupancy," the original landlord was required to "have completed Tenant's building in accordance with the Approved Drawings and Specifications." Lease ¶ 12(A)(ii). Apparently, however, like in *Regency*, the original landlord failed to fulfill its obligation. Also like *Regency*, because the building was required to be completed in accordance with the drawings and specifications "prior to and as a condition to the Date of Occupancy," we believe that the obligation to build a conforming structure accrued on that date, which was before the Lease was assigned to Developers Diversified. In other words, the Lease provision at issue did not simply require a conforming structure at some point during the lifetime of the interest; rather, it required a conforming structure by a particular date—i.e. prior to the tenant's occupancy. *See* Lease ¶ 11(A) (defining "Date of Occupancy").

Second, given the Lease's requirement that the building be constructed in accordance with the specifications "prior to and as a condition to the Date of Occupancy," App'x at 73 (Lease ¶ 12(A)(ii)), holding Developers Diversified liable for the original landlord's failure to construct the building in a conforming manner would ignore the fact that the tenant occupied the building without complaint. Although not raised by either party, it is arguable that the tenant's failure to object to the construction of the building at the time the promise came due—i.e., occupancy or a reasonable time thereafter—waived any claim for breach. The fact that the tenant had no obligation to inspect the roof in order to ensure that it was in good repair does not mean that it did not have some obligation to inspect the property to ensure that it conformed with the contractual specifications prior to occupancy. Of note, the Lease contains a provision allowing the tenant to terminate the Lease and collect liquid damages in the event that the building "shall not have been substantially completed in accordance with the Approved Drawings and Specifications . . . and the requirements and provisions of this Lease," which the tenant never invoked. *See* Lease ¶ 11(B).

Third, we do not agree with an analogy between the Lease provision at issue here and a promise to "keep a building in accordance with housing code safety and health standards." Certainly, if Lease ¶¶ 6F and 12(A)(ii) required the landlord to "maintain" or "keep" the building in accordance with the original building specifications, then we would find the analogy more convincing because the plain language would signify an ongoing covenant or an indefinite obligation. But the obligation to maintain the roof in good repair was set forth in the Lease separately, *see* Lease ¶ 14(A)(i), and there is a distinct Lease provision, *see* Lease ¶ 14(A)(vii), which

appears to require that the landlord ensure that the building remain compliant with the original specifications. If Developers Diversified should be held liable for anything related to the original construction defects, it would be under Lease ¶ 14(A)(vii), which is a question that we are remanding to district court.

In short, for all of these reasons, we conclude that the promise to construct a conforming building accrued prior to the original landlord's transfer of the leasehold interest to Developers Diversified. We do not believe that the failure to construct (as opposed to maintain or keep) the building in accordance with the specifications set forth in the Lease prior to the tenant's occupancy imposed a continuing obligation that was capable of successive and independent breach.

In sum, we conclude that, on the record before us, we can resolve Tokio's claim that Developers is liable for Service Hendon's failure to construct the building in accordance with the agreed-to specifications under Lease ¶¶ 6(F) and 12(A)(ii). We hold that Developers, as a successor to Service Hendon's interest in the leasehold, cannot be held liable for Service Hendon's pre-assignment breach that was incapable of continuous or independent repetition subsequent to Developers' assumption of the Lease. This opinion constitutes the opinion of the court on the matters discussed above. We join Judge White's opinion except for Part III-4.