**MISSOURI PORTLAND CEMENT COMPANY, Plaintiff,**

v.

**J. A. JONES CONSTRUCTION COMPANY, Defendant, and Third-Party Plaintiff,**

v.

**ENGLERT ENGINEERING COMPANY, Third-Party Defendant.**

**Civ. A. No. 4509.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Feb. 5, 1970.

and in failing to perform the contractor's guarantee contained in the contract specifications. Subsequently, Jones denied liability, cross-claimed against Missouri for $30,544.81,[2] the amount remaining unpaid on the contract, and instituted a third party action for indemnity against third party defendant, Englert Engineering Company (hereinafter Englert), to which Jones had subcontracted the steel erection work on the storage silos. This action was tried before the court, sitting without a jury, on November 25 and 26, 1969.

The court, having considered the pleadings, the trial briefs of counsel, the stipulations of the parties, the evidence adduced, and the proposed findings of fact and conclusions of law, now finds as follows:

T. G. Pappas, J. O. Bass, Bass, Berry & Sims, Nashville, Tenn., Robert Allen, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for plaintiff.

James C. Dale, Jr., Bailey, Ewing, Dale & Conner, Nashville, Tenn., for defendant-third party plaintiff.

David M. Keeble, Hooker, Keeble, Dodson & Harris, Robert W. Sturdivant, Trabue, Minick, Sturdivant & Harbison, Nashville, Tenn., for third party defendant.

## MEMORANDUM

FRANK GRAY, Jr., Chief Judge.

Plaintiff, Missouri Portland Cement Company (hereinafter Missouri), brought this action for $283,964 [1] against defendant-general contractor, J. A. Jones Construction Company (hereinafter Jones), for breach of contract in failing to erect the steel cement storage silos of the Nashville Cement Terminal in accordance with the contract plans

## FINDINGS OF FACT

1. On September 13, 1965, representatives of Missouri met with representatives of Jones in Jones's Nashville office to discuss generally the scope of the planned Nashville Cement Terminal and to negotiate concerning its construction.

2. Following negotiations, Missouri and Jones entered into a contract for the construction by Jones. The contract was in the form of a purchase order dated September 15, 1965, which provided that Jones construct the terminal in accordance with plans and specifications furnished by Missouri, said construction to be performed on a cost plus fee basis. The fee included compensation for Jones' skill, supervision, and assumption of the responsibility for the construction of the terminal.

3. Proximate to the time of their contracting, Missouri furnished Jones general construction plans prepared by Missouri's engineering department, mechanical specifications, electrical specifications, and other miscellaneous docu-

1. The parties, in the pretrial order entered November 24, 1969, stipulated $279,917.33 to be the correct measure of plaintiff's damages in the event that a recovery is decreed for plaintiff.

2. In the pretrial order, the parties stipulated the correct amount to be $24,012.25.

ments related to equipment purchases and construction schedules.

4. The mechanical specifications furnished by Missouri and entitled "Mechanical Specifications of Nashville Cement Terminal for Missouri Portland Cement Company at Nashville, Tennessee, September 10, 1965" include the guarantee which Missouri alleges was not performed by Jones. This guarantee applied only to the work done by the mechanical subcontractor, Buchi Plumbing Company, not a party hereto.

5. Subsequently, but prior to the beginning of construction, Missouri furnished Jones erection plans for the steel storage silos and columns of the terminal. These erection plans were prepared by Ingalls Iron Works (hereinafter Ingalls), which company also fabricated the steel for said silos and columns.

6. By purchase order dated November 12, 1965, Jones subcontracted the steel erection work on the storage silos and columns to Englert and furnished Englert copies of the steel erection plans prepared by Ingalls. For the sum of $49,865, Englert agreed to "erect and/or install" the storage silos and columns in accordance with their proposal dated October 14, 1965, which provided for such erection "as per Ingalls Iron Works Company Drawing, order number 3–1655, Drawing Number 1, Number 22 and *Sheets E1 through E7; all marked for approval October 1, 1965. * * *"* [Emphasis added.]

7. Of the erection plans furnished Englert, only two of the drawing sheets, E1 and E2, showed both the steel storage silos and their supporting columns. The structure was comprised of three steel silos, conical in shape at the bottom and cylindrical at the upper part, each supported by six columns. The joinder to the columns was at the upper part and was accordingly an angled connection.

8. Drawing sheets E1 and E2 called for each of the three silos to be welded to its six supporting columns by a three-eighths-inch ($\frac{3}{8}''$) continuous field weld at all points of contact between each silo and its supporting columns. The requirement of the weld was shown on the erection plans by a standard commonly-known welding symbol and the legend, "typ. all cols." There is no conflict in the evidence as to the meaning of the symbol and legend.

9. In figuring the amount of Englert's bid for the steel erection work, the welding symbol and legend were specifically noted by Englert's sales engineer, R. W. Mendl, and the cost of making the structural welds was included in the bid. Robert M. Marlin, Englert's assistant erection foreman on the Nashville terminal, testified that he saw the welding symbol and legend during the course of construction. Joseph M. Halliburton, Englert's erection foreman, testified that he possibly saw the said symbol and legend during construction.

The welding symbol and legend were plainly visible on the plans and were adequate to inform both Jones and Englert that the silos must be welded in accordance therewith.

10. At the points of connection between each of the eighteen columns and three silos, there were holes for seven-eighths-inch ($\frac{7}{8}''$) diameter bolts, and the bolt list furnished Englert with the plans specified that these should be high-tensile steel bolts. These bolts were supplied and installed by Englert.

Although there was some testimony indicating that machine bolts would normally be used, the use of the high-tensile bolts here was not unusual or misleading due to the angle of connection between the columns and silos. The purpose of the bolts here was to hold the columns and silos tightly together until the welds could be made.

11. Missouri had, as its representative on the Nashville terminal, a project engineer, Ben O. Neally, who resided in Illinois and was regularly employed in connection with the operation of a cement plant at Joppa, Illinois, and who visited the Nashville terminal on an average of one or two days a week.

Neally did not have an engineering degree and was not a registered professional engineer. Although Neally had had some experience with concrete construction, the Nashville terminal was his first experience involving steel construction.

12. Neally's function generally, as Missouri's representative for the Nashville terminal, was to act as a liaison between the terminal and Missouri's engineering office in St. Louis. His duties, more specifically, included co-ordinating shipments of materials and machinery sent by Missouri to the terminal, inspecting such materials and machinery for possible damage, taking progress pictures, and checking daily invoices and daily time sheets for cost coding. In addition, Neally's duties extended to the authorization of minor "additions" to the work, such additions being appropriately characterized in the proof as nothing more than "housekeeping details." He was not authorized to exercise control over the structural requirements of the job and had no actual, implied, or apparent authority to interpret the erection plans for the storage silos and columns or to authorize any deviation or deletion from the requirements of the erection plans.

13. In February of 1966, when construction had progressed to the point of connection between the columns and silos, Jim R. Wilson, Jones' job superintendent for the Nashville terminal, inquired of Neally as to whether Missouri wanted the connections between the columns and silos welded or caulked to keep water out and prevent rusting. The question did not concern any structural connection and was presented as an "extra" or "addition" to the contract between Jones and Missouri and not a change, deviation, or deletion from said contract. Neally told Wilson to "seal" weld the connections, said seal weld's sole purpose being to seal out the weather and not for structural support.

14. In May of 1966, near completion of construction, Neally noticed that the connections were open and contained no seal weld, and in response to Neally's inquiry, Wilson indicated that because the welders had left the job the less expensive method of weatherproofing at the time would be caulking. Neally agreed and authorized the caulking of the connections.

Neally did not refer to the erection plans in February or May and did not undertake to authorize any deviation or deletion from said plans.

15. Wilson was at the terminal daily and maintained a daily log or job diary. Copies of the daily report, which was a required communication between Missouri and Jones, were sent to Missouri's St. Louis engineering office, but were not sent to Neally in Joppa, Illinois. No entry was made regarding any omission, modification, or substitution of the three-eighths-inch (3⁄8″) structural weld as required by the steel erection plans prepared by Ingalls. The majority of the entries concerning Neally dealt with the minor "housekeeping details."

16. In addition to the daily reports, Jones, through Wilson and others of its personnel was in frequent contact with Missouri's engineering department in St. Louis with respect to any significant matters arising during construction of the terminal. There was never any mention regarding the structural welds.

17. In June of 1966, when initial loading of the middle silo of the terminal began, the weight of the silo and the cement caused the silo to drop to the ground, destroying the middle silo and its supports and substantially damaging the other two silos and their supporting columns.

18. The parties have stipulated, and the court finds, that each of the three storage silos was not welded by a three-eighths-inch (3⁄8″) continuous structural field weld to its six supporting columns, and that this lack of welding caused the middle silo to collapse under the initial load of cement.

## CONCLUSIONS OF LAW

1. The contracts involved herein were entered into in Tennessee, and

the obligations of the defendant and third party defendant thereunder were to be discharged in Tennessee. Accordingly, the substantive law of Tennessee must govern the decision. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

2. Under Tennessee law, a plaintiff is entitled to recover damages for breach of contract if the " *    *    * defendant's breach of contract was the direct and proximate cause of the damages which plaintiff has allegedly sustained, without concurring or contributing fault on the part of the plaintiff." Union Carbide Corp. v. Dunn Bros. General Contractors, Inc., 294 F.Supp. 704, 708 (M.D.Tenn.1968).

3. The defendant, Jones, breached its contract dated September 15, 1965, with the plaintiff, Missouri, by failing to construct the Nashville Cement Terminal in accordance with the central plans furnished by Missouri. Missouri did not cause, or contribute to, the breach of said central plans and is, therefore, entitled to recover from Jones.

4. The third party defendant, Englert, breached its contract dated November 12, 1965, with third party plaintiff, Jones, by failing to weld each of the three storage silos of the Nashville Cement Terminal to its six supporting columns by a three-eighths-inch ($\frac{3}{8}''$) structural field weld as was required by the steel erection plans prepared by Ingalls. Jones did not cause, or contribute to, the breach of said contract and is, therefore, entitled to recover from Englert.

## SUMMARY OF FINDINGS

At the conclusion of the trial of this action, the court, in announcing that it would be taken under advisement, remarked that it seemed to be a "case of the blind leading the blind leading the blind." But blindness, or more accurately carelessness, in and of itself, neither creates liability nor relieves of liability. Englert's duty to follow the plans for

the erection of the silos was not diminished by the failure of either Jones or Missouri to discover that it had not done so; likewise, Jones's duty as general contractor was not diminished by Missouri's failure in this regard.