438 F.2d 3
 J. A. JONES CONSTRUCTION COMPANY, Third Party Plaintiff-Appellee,
v.
ENGLERT ENGINEERING COMPANY, Third Party Defendant-Appellant.
MISSOURI PORTLAND CEMENT COMPANY, Plaintiff-Appellee,
v.
J. A. JONES CONSTRUCTION COMPANY, Defendant-Appellant.
 No. 20381.
 No. 20382.
 United States Court of Appeals, Sixth Circuit.
 January 12, 1971.
 
 J. C. Dale, Jr., Nashville, Tenn., Bailey, Ewing, Dale & Conner, Nashville, Tenn., on the brief; Fleming, Robinson & Bradshaw, Charlotte, N. C., of counsel for J. A. Jones Const. Co.
 J. O. Bass, Nashville, Tenn., T. G. Pappas, Nashville, Tenn., Robert S. Allen, St. Louis, Mo., on the brief; Bass, Berry & Sims, Nashville, Tenn., Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., of counsel, for Missouri Portland Cement Co.
 Robert W. Sturdivant, Nashville, Tenn., David M. Keeble, Nashville, Tenn., on the brief; Hooker, Keeble, Dodson & Harris, Trabue, Minick, Sturdivant & Harbison, Nashville, Tenn., of counsel, for Englert Engineering Co.
 Before TOM C. CLARK, Associate Justice,* PHILLIPS, Chief Judge, and JOHN W. PECK, Circuit Judge.
 
 
 1
 CLARK, Associate Justice.
 
 
 2
 This is an appeal from the judgment of the United States District Court for the Middle District of Tennessee awarding damages of $279,917.33 to Missouri Portland Cement Company, plaintiff-appellee (Missouri), against the J. A. Jones Construction Company, defendant-appellant (Jones), for breach of contract. The latter agreed to construct a cement terminal at Nashville, Tennessee, for Missouri according to the terms and specifications of a contract. Jones, by purchase order, subcontracted the steel erection work on three silos and their supporting columns at the terminal to Englert Engineering Company, third-party defendant (Englert). Upon the completion of the silos Missouri was loading cement into the middle silo for storage when it collapsed. The court found that Jones had breached the contract by failing to follow the plans and specifications thereof and entered a judgment for Missouri. It further found that Englert had in turn breached its contract with Jones and awarded the latter a judgment over and against Englert. We affirm the judgments.
 
 
 3
 The case was tried without a jury. A memorandum opinion with findings of fact and conclusions of law supporting the judgment was filed by the learned judge. 323 F.Supp. 242. The clarity and logic of this memorandum enables us to dispose of the case without detailed discussion.
 
 
 4
 The parties stipulated and the court found that the silo collapsed because none of the silos were welded to their supporting columns by a 3/8 inch continuous structural field weld as provided by the contract; and, in the event of a finding of liability, that the damage suffered by Missouri was the amount of the judgment now entered. The controlling issues, therefore, narrow down to questions of fact, i. e., which party caused the failure of the required welding to be performed, and whether Missouri contributed to the damage. The court concluded that Jones breached its contract and that Missouri had not contributed to the breach; that Englert had in turn breached its subcontract with Jones and that the latter had not contributed to its breach; and judgment was entered accordingly in favor of Missouri against Jones and over against Englert on behalf of Jones.
 
 
 5
 At the outset it is well that we state what is not disputed: the contract and the subcontract by purchase order are valid; the erection drawings and basic contract call for each of the three silos to be welded to its respective supporting columns by a 3/8 inch continuous structural field weld; the additional cost incident to making this weld is included in the contract; none of the silos were welded by a 3/8 inch continuous structural field weld to their respective supporting columns despite the fact that such welds were required by the contracts and designated on the erection drawings actually used in the construction, and, finally, this lack of welding caused the middle silo to collapse under the initial load of cement that was placed upon it, resulting in the damage the amount of which was stipulated.
 
 
 6
 Jones has two assignments of error. First, that Missouri's project engineer, Neally, had actual or apparent authority to interpret the erection drawings and to direct the caulking of the connections in lieu of welding them; and that Neally's instructions directly caused or contributed to the failure to weld the connections between the silos and the supporting columns. Second, that notice to Neally that the silos were not welded to their supporting columns prior to the loading of the cement into the middle silo was imputed to Missouri and, therefore, the latter cannot recover from Jones. Both the evidence and the findings are against Jones on these points.
 
 
 7
 We start with the proposition that Rule 52(a) of the Federal Rules of Civil Procedure provides that in actions tried upon the facts without a jury, the findings of fact of the trial judge "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Numerous cases of this and other federal courts have construed this to mean that the findings of fact are "presumptively correct," Why Corporation v. Super Ironer Corporation, 128 F. 2d 539 (C.A. 6 1962). Moreover, the burden is on those who question a finding of the District Court to show that it is clearly erroneous. Hudspeth v. Esso Standard Oil Co., 170 F.2d 418 (C.A. 8 1948). And, finally, the findings "are not clearly erroneous unless the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake was committed; and the burden is upon appellant to show such a mistake." S. C. Johnson & Son, Inc. v. Johnson, 266 F.2d 129, 143 (C.A. 6 1959). We conclude that the findings below are completely supported by substantial evidence.
 
 
 8
 First, as the District Court found, Neally's instructions, pursuant to the inquiry as to sealing or welding, were "to `seal' weld the connections, said seal weld's sole purpose being to seal out the weather and not for structural support." Thereafter, when told by Wilson, the job superintendent of Jones, that "the welders had left the job," Neally agreed and authorized the "caulking of the connections." However, as the court found, "Neally * * * did not authorize any deviation or deletion from said plans." Indeed, the evidence is uncontradicted that neither Wilson nor Neally knew that the plans or erection drawings required a continuous structural field weld. The requested instructions as to welding or caulking were directed solely at keeping the water out and preventing rusting of the connections — "as an `extra' or `addition' to the contract between Jones and Missouri and not a change, deviation or deletion from the contract." The evidence is crystal clear that the question presented to Neally "was whether we wanted to caulk or weld them to keep water out of the joint and stop * * * to keep them from rusting * * * as an extra to our contract and * * * no question of any structural connection." To the question: "You were agreeing to a substitution of structural, three-inch weld, for a caulking were you?" the answer was flatly "no."
 
 
 9
 The District Court further found that Neally had no engineering degree, was not registered as a professional engineer, and had the function of acting "as a liaison between the terminal and Missouri's engineering office in St. Louis. His duties included coordinating shipments of materials, inspecting them for possible damage, taking progress pictures, checking daily invoices and time sheets, etc. He did have authority to make minor "additions" characterized as "housekeeping details." He was not, the District Court found, "authorized to exercise control over the structural requirements of the job and had no actual, implied or apparent authority to interpret plans * * * or to authorize any deviation or deletion from the requirements of the erection plans." We agree with the District Court as to the evidence. In fact, Neally did not even know how to read the erection drawings, much less know of the necessity for having a continuous structural field weld at the connections. How could he authorize a deviation from the plans when he never knew what the plans required?
 
 
 10
 In this connection Jones says that Neally's direction to "seal" weld the connections would exclude the making of structural welds. But since Neally admittedly did not know that the continuing structural field welds were required, how would he know that he was making a choice? Neither Jones' nor Englert's people told him. He had no authority to make such a decision in any event.
 
 
 11
 Neither will Jones' second contention withstand scrutiny. The argument is that since Neally actually learned that the connections were not welded before Missouri filled the middle silo, this knowledge was imputed to Missouri. But even admitting Neally's authority, he never knew the necessity of the weld from a structural standpoint nor the fact that the plans required it. He, therefore, never reported it since it was merely a weather preventive, as he understood it, and not a structural problem. Missouri could hardly be held responsible under these conditions. The complete answer is, of course, that Neally had no authority and hence there could be no legal imputation in any event.
 
 
 12
 Englert claims that there should be a reversal or at least some contribution between it and Jones. The basis of the contention is the answer, at the trial, of Jones' job superintendent, Wilson, to this question:
 
 
 13
 "Q. And so what instructions then were given to Mr. Halliburton? You said bolt them? A. That they be bolted and Mr. Neally would tell him what to torgue the bolts to when he * * *.
 
 
 14
 "Q. (Interposing) Bolted and not welded, is that right? A. Yes, sir."
 
 
 15
 However, Englert has taken the question out of the context of Mr. Wilson's testimony. Immediately upon hearing this testimony the court said: "Well, now, Mr. Wilson, we've got a little conflict here between what you are saying now and what you said about ten minutes ago. And I would like to get it clear." The testimony of Wilson then clearly revealed — as the court concluded — that Mr. Wilson did not know that the plans and erection drawings required the continuous structural field welds. His understanding of what Mr. Neally authorized was "this sealing of these joints against the weather * * * all the conversation around this particular thing revolved around sealing it out from the weather." We therefore, conclude, as did the trial court, that Mr. Wilson never authorized any structural change. Indeed, as was true of Mr. Neally, Wilson never knew that the plans and erection drawings required the continuous structural field weld until after the silo had collapsed. He could hardly be said to have authorized a deviation from the plans and erection drawings when he never knew what they required.
 
 
 16
 Furthermore, the facts reveal that Englert made itself primarily responsible for the performance of the contract. (1) It agreed to erect the structural steel and three silos "only as per Ingalls Iron Works Company drawing, Order No. 3-1655, Drawing number 1 and number 22 and sheets E 1 through E 7." Sheets 1 and 2, as the court found, both showed the welding symbols requiring the continuous structural field weld of the silos to the steel columns and Englert's welding foreman testified that he saw the welding symbols on the drawings. (2) Englert included the cost of the welding in its price for the subcontract job. (3) Englert was a specialist in the erection of steel and an expert in this field. It held itself out as such and Jones relied upon its experience and qualifications to perform the job as required by the Ingalls drawing. It is also of significance that the welding symbols were not called to the attention of Wilson or Neally by Englert's erection foreman or welding foreman when they raised the question of what type of connection to make.
 
 
 17
 In view of these considerations we find that the District Court was fully justified in finding no contributory or concurrent negligence on the part of Jones.
 
 
 18
 Having carefully considered all of the contentions raised by the appellants, each of the same are rejected and the judgments are affirmed.
 
 
 
 Notes:
 
 
 *
 Associate Justice, Supreme Court of the United States, retired, sitting by designation