NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0044n.06

No. 16-6615

**FILED**
Jan 23, 2018
DEBORAH S. HUNT, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DEVELOPERS DIVERSIFIED OF TENNESSEE, )
INC., n/k/a DDR CORP., )
)
    Plaintiff/Counter-Defendant/Appellee, )
)
v. )
)
TOKIO MARINE & FIRE INSURANCE CO., )
)
    Defendant/Counter-Plaintiff/Appellant. )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

**BEFORE: MOORE, WHITE, and DONALD, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Defendant/Counter-Plaintiff/Appellant Tokio

Marine & Fire Insurance Co. (Tokio) appeals the district court's judgment in favor of

Plaintiff/Counter-Defendant/Appellee Developers Diversified of Tennessee, Inc. ("DD")[1] in this

declaratory-judgment action to determine DD's liability as landlord for property damage

resulting from a partial roof collapse over retail space leased by Tokio's insured, Sports

Authority, Inc. ("SA"). We **AFFIRM**.

---

[1] When this action was commenced, Appellee was known as "Developers Diversified of Tennessee, Inc."
At some point, it changed its name to "DDR Corp."

## I. BACKGROUND

### A. Facts

We summarized the underlying facts in our prior opinion.

> [SA] entered into a lease agreement [("the Lease")] in January 1998 with Hendon Investments (Hendon) to lease retail space in a Brentwood, Tennessee, yet-to-be-built shopping center. Hendon assigned the [L]ease to Service Hendon Cool Springs Associates (Service Hendon). Service Hendon retained an architectural firm, Pieper, O'Brien, Herr Architects, Ltd. (Pieper), to design the shopping center, including [SA's] space. The Lease provided that [SA's] building would be designed and constructed in general accordance with prototypical drawings and specifications submitted by [SA]. Pieper submitted drawings and specifications, which [SA] approved. Sub-contractor Holland Roofing installed the roof.

> Construction of the shopping center was completed, and [SA] occupied the leased premises in September 1998. Plaintiff DD entered into a purchase and sale agreement in July 1998 to acquire the shopping center from Service Hendon, although the transaction did not close until after construction was completed in April 2000. Pursuant to the agreement, Service Hendon assigned and DD assumed [SA's] [L]ease. The "Assignment and Assumption of Leases" between DD and Service Hendon provided that DD "assumes and agrees to perform all of the terms, covenants, obligations and conditions of the Lease . . . in respect of the period from and after the date of this Assignment."

> After acquiring the shopping center in April 2000, DD, through a property management company, retained Foresight Consulting, Inc., and CHM Roof Consultants to inspect the roof. Neither reported any problem or defect to DD. Following a severe rain storm in May 2003, part of the roof over [SA's] store collapsed and merchandise was damaged.

*Developers Diversified of Tennessee, Inc. v. Tokio Marine & Fire Ins. Co.*, 415 F. App'x 653, 655 (6th Cir. 2011) (record citations omitted). Tokio, as SA's insurer, covered the loss of merchandise, and as SA's subrogee, asserted a right to reimbursement from DD. DD then brought the instant declaratory-judgment action to determine its obligations to Tokio. DD argued that SA had not provided it with notice that the roof was in need of repair, and, therefore, DD was not in default of the Lease's covenant to repair. Tokio "counterclaimed for its

subrogated damages, alleging that [DD] breached the Lease by failing to correct defects in the

[r]oof's drainage system and . . . by failing [to] maintain the [r]oof (generally and in a [c]ode-

complaint state), which allowed rainwater to pond on the [r]oof[,]" causing the collapse.

(Appellant's Br. at 2.)

## B. The Lease

The key provisions of the Lease provide:

6. *DRAWINGS AND SPECIFICATIONS*
A. *Generally.* Tenant's Building and the Site Improvements shall be constructed
by Landlord . . . in accordance with the Approved Drawings and Specifications[.]

\* \* \*

F. *Construction of the Building and Site Improvements/Incorporation of Materials
and Components from Tenant's Prototypical Store Drawings and Specifications.*
Tenant's Prototypical Store Drawings and Specifications, the Approved Drawings
and Specifications and the Approved Site Improvement Drawings and
Specifications shall constitute a part of this Lease; provided however that
Landlord shall construct Tenant's Building in accordance with the Approved
Drawings and Specifications (or any revisions thereto approved pursuant to the
provisions of Article 6.D hereof) and shall construct the Site Improvements in
accordance with the Approved Site Improvement Drawings and Specifications
(or any revisions approved pursuant to the provisions of Article 6.E hereof.)
Notwithstanding the approval by Tenant of the Approved Drawings and
Specifications or the Approved Site Improvement Drawings and Specifications,
Landlord shall incorporate all of the materials and components specified in
Tenant's Prototypical Store Drawings and Specifications into the Approved
Drawings and Specifications and the Approved Site Improvement Drawings and
Specifications and to the extent such materials and components are not
incorporated or replaced by a substitute written approval by Tenant in its sole and
absolute discretion, Tenant shall receive a credit to be applied toward Tenant
Requested Change Orders and if no such Tenant Requested Change Orders are
received or if Tenant's credits are not offset by Tenant Requested Change Orders,
then Landlord shall pay Tenant an amount equal to the credit within sixty
(60) days of the Date of Occupancy[.]

\* \* \*

*8. GUARANTEE OF MATERIALS.*  Landlord shall unconditionally guarantee all work performed by or for Landlord in the construction of Tenant's Building and the Site Improvements against defective workmanship and materials for the period of one (1) year from the commencement of the Lease Term.  On the Date of Occupancy, Landlord shall assign to Tenant any and all guarantees of workmanship and materials which it is required to receive (by Tenant's Prototypical Store Drawings and Specifications, the Approved Drawings and Specifications and the Approved Site Improvement Drawings and Specifications) relating to items Tenant is required to repair and maintain, provided, however that notwithstanding such assignment, landlord shall use its commercially reasonable, diligent and good faith efforts to enforce such one (1) year guaranty and any other unexpired non-assignable warranties and guarantees relating to such items at Tenant's request and on Tenant's behalf.  Landlord's assignment to Tenant of any and all guarantees of workmanship and materials for items Tenant is required to repair and maintain pursuant to the terms of this Lease shall not relieve Landlord of any obligations relating thereto which are Landlord's obligation pursuant to the provisions hereof.  Within thirty (30) days of the Date of Occupancy, Landlord shall provide Tennant with close out books assigning the warranties and guaranties required herein to Tenant.

\* \* \*

12. *LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS*

A. *Representations, Warranties and Covenants.*  Landlord hereby represents, warrants and covenants as follows:

\* \* \*

(ii) Prior to and as a condition of the Date of Delivery of Possession, Landlord shall have substantially completed and prior to and as a condition to the Date of Occupancy Landlord shall have completed Tenant's Building in accordance with the Approved Drawings and Specifications (and any modifications thereto requested and approved by Tenant in accordance with Article 6.D. hereof) and shall have delivered to Tenant a final Certificate of Occupancy for Tenant's Building and the Site Improvements [.]

\* \* \*

14. *REPAIRS AND MAINTENANCE*

A. *Tenant's Building.*  Tenant shall make and pay for all maintenance, replacement and repair necessary to keep Tenant's Building in a good state of repair and in tenantable condition except for the items set forth in Article 17 hereof (which are designated as Landlord's responsibility) and the following maintenance, replacement or repair which shall remain the Landlord's sole

responsibility unless Tenant, its employees, contractors, agents or invitees, caused the need for such repair, in which event Tenant shall pay only its contributing factor if Landlord gives notice to Tenant of Landlord's reasonable allocation of the costs between Tenant and other parties to be named by Landlord in said notice, and Tenant reasonably agrees to such allocation. Said notice shall also include the percentage allocation to each such contributing party for each item of repair. In the event of a dispute between Landlord and Tenant with respect to said allocation, Landlord shall be entitled to pursue such remedies as are available under this Lease or at law.

> (i) all maintenance, replacement and repair to the roof, slab . . . , outer walls, interior walls (to the extent of structural maintenance, replacement and repair) and structural portions of the Building . . . which shall be necessary to maintain the Building in a safe, dry and tenantable condition and in good order and repair . . . ;

> * * *

> (iv) all maintenance, replacement and repair due to the acts, omissions, neglect or negligence of Landlord, or any other owner, occupant or tenant in the Shopping Center and each of their employees, agents, or contractors;

> * * *

> (vi) all maintenance, replacement and repair to the gutters and downspouts of the Building necessary to keep the same in good order and repair;

> * * *

> (vii) the costs of correcting defects in or inadequacies of the initial design or construction of Tenant's Building, the Site Improvements or the Common Areas or repair and replacement of any of the original materials or equipment in Tenant's Building, the Site Improvements or the Common Areas required as a result of such defects or inadequacies;

> * * *

[¶5] Landlord shall use reasonable and good faith efforts to stage, sequence, and perform any repair, maintenance or replacements to the Building to minimize the disruption of and interference with Tenant's business and operations and upon commencement of such repair, maintenance or replacement shall be continuously prosecuted and all repairs, maintenance and replacements to the Building performed by or on behalf of the Landlord shall be performed in a good,

workmanlike and lien free manner and in compliance with all applicable legal and governmental and quasi-governmental requirements . . . .

* * *

17. *GOVERNMENTAL REGULATIONS.* Tenant shall observe and comply with all requirements, rules, orders and regulations of the federal, state and municipal governments or other duly constituted public authority affecting Tenant's Building, including the making of structural and non-structural alterations, insofar as they are due to Tenant's specific occupancy and not retail occupancy in general; provided, however, in the event such rules, orders and regulations shall . . . (b) require structural or non-structural changes which are not due to the specific use of the premises by Tenant and are due to the general retail nature of the use, then and in . . . such event[ ], the same shall be complied with by Landlord at its sole cost and expense. Tenant shall have the right, however, to contest, without cost to Landlord, the validity or application of any such rule, order or regulation required to be complied with by Tenant in accordance with the foregoing . . . .

(Appellant's App'x Vol. II, at 281- 316.)

### C. The Roof and Construction Defects

SA's roof's framework

consisted of trusses . . . designed to span a distance between load points (e.g. columns). The trusses that spanned from the front west wall ("Wall D1") to rear east walls ("Wall D5" and "Wall D6") were denominated "joists," and the trusses that spanned from the north side wall ("Wall DA") and south side wall ("DF Wall") were denominated "joist girders."

(Appellant's Br. at 25.) Joist girders supported joists, which supported the roof, and "where the joist girders met the [masonry] walls, they were embedded in [them]." (R. 407, PID 8003.) The exterior walls extended up above the roof plane, forming a "parapet" which enclosed the roof. (Appellant's Br. at 27.) Because the roof was flat, the architect sloped the roof as it progressed from the front to the rear of the building, "[t]o drain the rainwater that would otherwise be trapped by th[e] [parapet] walls." (*Id.*)

> The [r]oof was additionally and more drastically sloped along its sides (Walls DA and DF) – a slope that tapered center as the roof progressed from front to rear. The combined effect of these slopes directed all rainwater to a collection basin at the center rear of the [b]uilding where five crickets (submembrane projections designed to divert water) were supposed to direct rainwater to and through five unobstructed 6" x 18" scuppers (masonry-block sized outlets [for draining water] installed through the parapet walls and level with the roof surface), and off the [r]oof.

(*Id*. at 27-28 (record citations omitted).)

Tokio maintains that the roof failed because it did not accord with the original design in the following ways: (1) the number and the location of the scuppers were inverted: two were installed on Wall D6 when three were called for by the building's design, and three were installed on Wall D5 when two were called for by the design; (2) although the design called for the Wall D6 scuppers to be only six inches lower than those on Wall D5, the constructed slope made the differential ten inches; (3) the crickets called for by the design were not constructed; (4) concrete blocks were installed in the throat of the Wall D6 scuppers, restricting the flow of water off the roof; and (5) four-inch tall ballast-retaining bars were installed in front of the scuppers, blocking them. According to Tokio, construction of the building's walls also did not accord with the design because "the masonry column built into the [b]uilding's rear wall [('The D6/DC Masonry Column')], which supported the joist girder that collapsed, should have been topped with a reinforced concrete cap but was, instead, topped with a masonry cap."[2]

(Appellant's Br. at 10, 34.)

---

[2] Tokio also maintains that a "bond beam," designed to support the joists near the rear walls of the building, was not installed. However, Tokio concedes that the missing bond beam played no role in the collapse.

No. 16-6615, *Developers Diversified of Tenn., Inc. v. Tokio Marine & Fire Ins. Co.*

### D.  Procedural History

The district court granted summary judgment to DD, and Tokio appealed.  In *Developers Diversified of Tennessee, Inc. v. Tokio Marine & Fire Ins. Co.*, 415 F. App'x 653 (6th Cir. 2011), we affirmed the district court's order granting DD summary judgment on Tokio's claim that DD is liable for the failure to construct the building in accordance with the Lease,[3] and reversed and remanded for the district court to address the remaining issues, whether DD: 1) failed to maintain and repair the roof, as required by Lease ¶14(A)(i); 2) failed to remediate construction defects as required by Lease ¶14(A)(vii); 3) failed to ensure that all maintenance was performed in a good, workmanlike manner, as mandated by Lease ¶14(A)¶5; and 4) failed to assume responsibility for its roof inspectors' alleged negligence, as required by Lease ¶14(A)(iv).  We also remanded for the district court to decide in the first instance whether DD failed to comply with any applicable government regulations by allegedly maintaining the building in a code-violative state, in contravention of Lease ¶¶17 and 14(A)¶5.  *Id*. at 669.

On remand, following a bench trial, the district court declared that DD had no duty to pay Tokio for any subrogated damages and dismissed Tokio's counterclaims.  This appeal followed.

---

[3] We precluded liability for default under Lease ¶¶6(F) and 12(A)(ii) for failing to construct the building in accordance with the original design because DD "as a successor to Service Hendon's interest in the leasehold, cannot be held liable for Service Hendon's pre-assignment breach that was incapable of continuous or independent repetition subsequent to [DD's] assumption of the Lease." *Developers Diversified*, 415 F. App'x at 673.

## II.  STANDARD OF REVIEW

Where, as here, the district court has conducted a bench trial, we review the district court's findings of fact for clear error and its conclusions of law de novo.  *Kalamazoo River Study Grp. v. Menasha Corp.*, 228 F.3d 648, 652 (6th Cir. 2000) (citing *Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999)).  "Clear error occurs only when [the court is] left with the definite and firm conviction that a mistake has been committed.  If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003) (internal quotation marks and citation omitted).  Even greater deference is required when the findings of fact rest upon credibility determinations.  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

## III.  ANALYSIS

Tokio argues on appeal that (1) the district court erred in finding that Tokio failed to prove by a preponderance of the evidence that any alleged breach of the Lease was the direct and proximate cause of the roof collapse; (2) the district court erred in concluding that constructive notice of the construction defects that allegedly caused the collapse was a precondition to finding that DD breached the obligations established by Lease ¶¶14 and 17, and, even if constructive notice was a necessary precondition, the district court erred in concluding that DD did not have such notice; (3) the district court erred in concluding that Lease ¶8's one-year workmanship-and-materials guarantee precluded finding that DD breached Lease ¶¶14 and 17; (4) the district court

erred by concluding that SA's Tenant Estoppel Certificate waived all claims for breaches of the Lease arising from patent construction defects; and (5) the district court erred in concluding that SA's failure to complain about the alleged construction defects after occupying the building waived all claims for breaches of Lease ¶¶14 and 17.[4]

Because the district court did not clearly err in finding that Tokio failed to prove causation and notice, we affirm.[5]

## A. Applicable Law

All agree that Tennessee law applies. *First Am. Nat'l Bank v. Fidelity & Deposit Co. of Md.*, 5 F.3d 982, 984 (6th Cir. 1993). Under Tennessee law, "[t]he legal effect of the terms of a lease are governed by the general rules of contract construction." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889 (Tenn. 2002). Our initial task in construing a lease "is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) (citation omitted). Courts determine the parties' intent by examining the plain and ordinary meaning of the written words that are "contained within the four corners of the contract." *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)

---

[4] Tokio also argues that the district court's opinion should be read with a "jaundiced eye" because the district court copied verbatim from DD's proposed factual findings and conclusions of law. (Appellant's Br. at 6-7.) Thus, according to Tokio, entire sections of the district court's decision reflect DD's lawyers "zeal and advocacy" rather than "the product of a disinterested mind." (*Id.*) However, this does not change our standard of review. *See Anderson*, 470 U.S. at 572 ("[W]hen the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.") (citations omitted).

[5] The district court found in DD's favor on several alternative bases. However, because causation and notice are independently sufficient to affirm the district court's judgment, we need not address the remaining, alternative bases for the district court's judgment or discuss the court's ruling regarding the Tenant Estoppel Certificate, one-year workmanship-and-materials guarantee, and waiver.

No. 16-6615, *Developers Diversified of Tenn., Inc. v. Tokio Marine & Fire Ins. Co.*

(citation omitted); *see also Warren v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 955 S.W.2d 618, 623 (Tenn. Ct. App. 1997) ("We are precluded from making new contracts for the parties by adding or deleting provisions.") (citation omitted). The literal meaning of the contract language controls if the language is clear and unambiguous. *Allmand*, 292 S.W.3d at 630. However, if the terms are ambiguous in that they are "susceptible to more than one reasonable interpretation," courts must apply other established rules of construction to aid in determining the contracting parties' intent. *Planters Gin Co.*, 78 S.W.3d at 890 (citation omitted).

In Tennessee, "[i]n actions of contract, generally speaking, the damages are limited to the natural and proximate consequences of the breach complained of, and damages remotely or consequentially resulting therefrom, or merely speculative damages, cannot be claimed." *Walker v. Ellis*, 33 Tenn. 515, 523 (1853); *see also Missouri Portland Cement Co. v. J. A. Jones Const. Co.*, 323 F. Supp. 242, 246 (M.D. Tenn. 1970), *aff'd sub nom. J. A. Jones Const. Co. v. Englert Eng'g Co.*, 438 F.2d 3 (6th Cir. 1971) ("[A] plaintiff is entitled to recover damages for breach of contract if the . . . defendant's breach of contract was the direct and proximate cause of the damages which plaintiff has allegedly sustained, without concurring or contributing fault on the part of the plaintiff.") (internal quotation marks and citation omitted).

## B. Causation

In its "Answer and Third Amended Counter-Claim" (Answer), Tokio alleged that

> the combination of the aggressive slope, absent crickets, collector boxes without overflow protection, and retainer bars (the "Roof Defects"), each compromised the roof's drainage system, impeded the roof's ability to shed water, and allowed water to pond on the lowest portion of the roof where the collapse eventually occurred.

(R. 271, PID 3364, ¶33.) Tokio also alleged that the Roof Defects "violated applicable governmental regulations, including the Brentwood Municipal Building Code ('Code')." (*Id.* ¶34.) Further, according to Tokio's Answer, the roof's drainage system was compromised by "[t]he existence of debris on the roof, including timber, concrete blockings, sheet metal and any other debris[.]" (*Id.* at 3365, ¶43.) However, notwithstanding Tokio's initial allegations of several different Roof Defects, Tokio's pre-trial theory focused on the "retainer bars blocking scupper openings, debris on the roof, and violation of Code Ordinances . . . ." (R. 366, PID 6321.)

All agree that it was Tokio's burden to prove that any of the alleged defects and Code violations caused the roof to collapse.

### 1.

Tokio's theory at trial, as stated by Tokio's main expert, David Wright, was that the accumulation of eighteen inches of rainwater on the roof caused it to collapse. Both parties' hydrology experts agreed that in order for eighteen inches of rainwater to pool on SA's roof,

three and a half to four of the five scuppers would have to have been completely blocked or clogged when it began to rain.

The district court did not credit Wright's opinion that the accumulation of eighteen inches of rainwater caused the collapse. The district court observed that "Wright, on numerous occasions, testified contrary to previous deposition testimony. He also attempted to evade questions asked of him by [DD]'s counsel. He often spoke in highly technical terms, without explaining his testimony in a logical, coherent, and understandable manner." (R. 407 PID 8051.) "Wright changed his theory several times during the course of this case." (*Id.*) Indeed, Wright admitted at trial that his initial report, which he later withdrew, contained erroneous conclusions. He explained that, at the time he prepared the report, he did not have certain "critical information" and documents from Vulcraft, the manufacturer of the joists and joists girders. Wright did not, however, mention in his report that he needed those documents. Wright's second report also contained errors, which he admitted at trial. He again explained that, at the time he completed his second report, he had not yet received the Vulcraft documentation. Again, however, he failed to mention that in his report. Wright revised his analysis two more times after that. The district court was entitled to take the shifting positions into consideration in determining what weight to give to Wright's opinions.

The district court credited instead the testimony of DD's expert, William Dickey, who testified that "[f]or the joist girder that collapsed to have failed solely as a result of the weight

load of an excessive water accumulation on the roof, the depth of ponding on the roof would have had to be over 22 inches at the rear (D6) wall." (R. 407 PID 8015 (citing Dickey Trial Test., R. 381, PID 7491-93).) According to both parties' hydrology experts, to achieve a theoretical water accumulation of over twenty-two inches, every one of the five scuppers would have to be completely blocked or clogged. But the district court observed that "[n]o evidence was introduced that any, let alone 4 to 5, of the 5 roof scuppers were completely blocked or clogged with debris at the time of the partial collapse." (R. 407, PID 8014.) The district court credited Dickey's testimony that it was "not conceivable" that the scuppers were "one hundred percent blocked." (R. 407, PID 8039 (quoting Dickey Trial Test. R. 380, PID 7403).) Dickey testified, in part:

> I have no data at all that would give me any indication that two or three or four scuppers would become a hundred percent blocked and put a huge amount of water on this roof and cause the joist girder to collapse under an extreme overload situation, was not something I was going on.

(R. 380, PID 7411.) Tokio's expert, Thomas Allen, also testified that he had no information or evidence that any of the five scuppers was completely blocked. Even Tokio's main expert, Wright, testified that he was not aware of any evidence to support the conclusion that any of the five scuppers was blocked, and that "it's impossible for [him] to predict exactly what the depth of the water was at the time of the collapse." (R. 378, PID 6982.)

As to any debris clogging the scuppers, the district court again credited Dickey's testimony:

> I could not conceive of the scuppers being 100 percent blocked before the rainstorm started, which is the basis of the hydraulics analyses that have been done. The water estimates from those analyses are all upper-bounds. They all overestimate the water. And unless somebody went out there with pieces of plywood and nailed them over the scuppers, there is no way I can concede [sic] of them being a hundred percent blocked.

(R. 380, PID 7401.) Moreover, a roof inspection performed just one week before the collapse revealed only a few concrete blocks on the roof, which, as DD's expert testified, "wouldn't float." (Douglass Dep., Appellee's App'x, Vol. XIV, at 2687.) Although the report notes that there was "debris scattered throughout the roof area[,]" it contains only one photograph of the debris, depicting the concrete blocks. (Appellee's App'x, Vol. IX, at 1627.) The inspector, Elliott Buss, testified that had there been any other debris, he would have taken a picture of it and included it in his report. He also testified that he did not see anything blocking the scupper openings. Finally, Tokio admitted that "[n]o complete blocking or complete clogging of any scupper on the subject roof was ever observed or reported either before or after the collapse by anyone during any pre-collapse roof inspections, including the roof inspection performed just one week before the partial roof collapse." (R. 308, PID 4255-56.) Thus, the district court did not clearly err when it found that "[n]o evidence was introduced that any, let alone 4 to 5, of the 5 roof scuppers were completely blocked or clogged with debris at the time of the partial collapse." (R. 407, PID 8014.)

**2.**

Tokio also argued at trial that the retainer bars contributed to the blocking of the scuppers; the district court, however, disagreed and found that the retainer bars were "appropriate" and "necessary." The district court credited the deposition testimony of the representatives of Holland Roofing of Nashville, Inc. (Holland), the company that installed SA's single-ply, ballasted roof and that "had worked on 'hundreds' of roofs[.]" (R. 407, PID, 8005 (citing Stark (Former president of Holland) Dep., Appellee's App'x, Vol. XVIII, at 3472).) Holland's representatives testified that the retainer bars installed on SA's roof were standard bars manufactured by the roof manufacturer, Carlisle, and were what Holland typically installed on scuppers.[6]

The representatives of the companies involved in the inspections of SA's roof, Foresight Consulting, Inc. (Foresight) and CHM Roof Consultants, Inc. (CHM), also agreed that some form of scupper guard is needed for a ballasted roof. And, before the collapse, neither company had recommended the removal of the installed scupper guards. The district court also noted the deposition testimony of Scott Christenson, CHM's inspector who had nearly thirty-five years of experience as a roofer, roof inspector, and roof consultant, regarding his inspection of SA's roof in August 2001:

---

[6] Jim Stark, Holland's former president, who worked in the roofing industry for approximately twenty years, also testified that "he expects to see a gravel stop or a gravel-retaining bar in front of scupper[s] on a ballasted roofing system." (R. 308, PID 4267.) Grant Stout of Pieper, O'Brien, Herr, one of the original architects of the building, agreed that with a single-ply, ballasted roof, it is necessary to have some protection in front of scuppers to prevent rock, ballast, and other materials from blocking the down-spouts.

> A strong thunderstorm rolled in during his inspection of the SA roof, causing a heavy downpour for several minutes. When Mr. Christenson resumed his inspection several minutes following the conclusion of the thunderstorm, he found that the rain water had drained from the roof and that there was no standing water or ponding on that roof. As a result of his observation of the roof completely draining following a heavy thunderstorm, Mr. Christenson determined that the SA roof drained adequately.

(R. 407, PID 8007-08 (record citations omitted).)

The district court additionally credited the deposition testimony of Elliot Buss, a Foresight inspector who inspected the roof on April 29, 2003, six days before the collapse. During the inspection, Buss saw no evidence of ponding on the roof or that the roof was not draining properly, and did not see anything requiring a consultation with or referral to an engineer or an architect; he also had no concerns about the retaining bars.

Finally, according to Tokio's expert, the installed retainer bars had a "very minimal" and "minuscule" effect on the amount of water accumulation; the data shows a difference of only .10 foot in predicted water ponding between the hydrological models with and without the retainer bars. (R. 378, PID 7023-26, Appellee's App'x, Vol. XI, at 2041-42.) Thus, the district court did not clearly err when it found that Tokio failed to prove that the bars had any meaningful impact on the alleged accumulation of water on the roof.

**3.**

Tokio next argues that because Dickey, DD's expert whom the district court found credible, testified that a wall defect likely caused the collapse, the district court should have concluded that Tokio established causation. Dickey indeed testified that the failure to install a

concrete wall cap, as the original construction design mandated, and the installation instead of a weaker, grout-reinforced masonry cap, "most likely" allowed the "DC" joist girder to "f[a]ll out of the [D6] wall." (R. 360, PID 7336.) Nevertheless, Tokio's argument fails.

First, viewed in context, Dickey's testimony about the missing concrete cap appears to be merely a hypothesis. Dickey also testified:

> It's important to understand, nobody knows the cause. Nobody knows a whole lot of things about this. As you know, the materials that collapsed, we were calling that the debris, was removed. We did not have an opportunity to review it or look at it. We have all agreed it would be of tremendous help in a forensic analysis to be able to view those parts. We did not see those. So we're trying to do a forensic analysis here by photograph and by speculation. And that's -- a bit hard . . . . [A]s I said, the cause is unknown[.]

(R. 380, PID 7323, 7335.) Dickey's uncertainty about the cause of the collapse is clear from the record. In one portion of his testimony, he pointed to "numerous construction errors associated with how the joists and the joist girders were *fastened* to the masonry wall." (R. 380, PID 7324 (emphasis added).) He opined that it was possible that "the bearing plate was too small," (R. 381, PID 7480), or "the material [was not] the right grade[,]" or a joist girder "g[o]t bent or kinked during the process of erecting [the wall][,]" or a joist girder was "burned slightly or completely removed in order to fit in some mechanical equipment[.]" (R. 380, PID 7336.) He testified, "[t]here's a whole lot of things that could have happened. And if we had examined the debris that was on the ground, we would know the answer to all of these possibilities." (*Id.*)

Second, Tokio argued at trial that "the DC Joist Girder could not have 'fallen out' of the D6 Wall as Dickey claimed." (Appellant's Br. at 45.) According to Tokio, Dickey's theory is

"implausible" and contradicted by documents and objective evidence. (*Id.* at 51 (citation omitted).) Moreover, Tokio's expert opined that the alleged wall defect, "the missing Concrete Cap[,] played no causative role in the collapse." (*Id.* at 44.) Thus, at trial, Tokio argued against the very theory it now claims satisfied its burden of proof.

Third, Dickey's hypothesis about the cause of the collapse was undermined by his concessions that it was not based on any calculations.

**4.**

Finally, as to any alleged building Code violations, the district court found none. (R. 407, PID 8014 ("There was no code violation, defect, or dangerous condition associated with the roof drainage system.").) Tokio, however, argues that the district court erred by relying on a temporary Certificate of Occupancy ("COO"), issued by a city official, which stated that the building met the Code. Moreover, according to Tokio, the district court erred when it relied on lay testimony of a city official that the building was Code-complaint.

It is true that "[the] interpretation of city and state building codes is a matter of law for resolution by the court and not a proper subject for testimony from at least that of a non-lawyer." *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 295 (6th Cir. 1999). However, even if the district court erred by crediting the opinion of a city official, Tokio failed to introduce any evidence that

any Code violations[7] directly and proximately caused the collapse. For instance, Tokio argues that "the testimony of [DD's] Code expert, William Pistrui, proves that the Building was not Code-complaint" because the roof did not have "a 4" deep, 8' wide band of ballast" along its walls.[8] (Appellant's Br. at 67.) However, Tokio presented no evidence that the absence of a 4" deep, 8' wide band of ballast played a role in the collapse of the roof.

**5.**

In sum, the district court found that "[e]ven assuming for purposes of argument that [DD] did commit a material breach or default under the Lease, Tokio failed to show by a preponderance of the evidence that any such breach or default was the direct and proximate cause of the roof collapse or any damages suffered by Tokio." (R. 407, PID 8052.) We are not "left with the definite and firm conviction," *Caver*, 349 F.3d at 351, that the district court clearly erred when it found that Tokio did not prove causation.

---

[7] And even Tokio's experts testified that the retainer bars did not violate any Code provisions. (*See also* R. 407, PID 8052 ("Tokio did not show by a preponderance of the evidence that there was any "code violation" in connection with the SA building, or that any such default directly and proximately caused the partial roof collapse.").).

[8] Pistrui in fact stated in his investigative report that "there [was] no Code violation, no defect, and no dangerous condition associated with the roof drainage system[,] including the scupper bar. Indeed, the roof drainage system exceed[ed] Code requirements." (Appellant's App'x, Vol. IV, at 713.)

### C. Constructive Notice

### 1.

Tokio next argues that the district court erred in concluding that constructive notice of the construction defects that allegedly caused the collapse was a prerequisite to liability under Lease ¶¶14 and 17.

Relying on *Marshalls of Nashville, Tenn., Inc. v. Harding Mall Assocs., Ltd.*, 799 S.W.2d 239, 244-45 (Tenn. Ct. App. 1990), we previously held that constructive notice is a prerequisite for recovering damages under Lease ¶14(A)(i). *Developers Diversified*, 415 F. App'x at 663. We did not, however, reach the question whether constructive notice is a prerequisite to liability for breach of the obligations established by any other provision of the Lease. We held only that "to the extent that *Marshalls* bears on the resolution of these independent breaches, the district court should read *Marshalls* as imposing only a constructive notice requirement." *Id.* at 664.

Although the district court did not consider whether *Marshalls* had any bearing on the remaining obligations under the Lease, it nevertheless correctly concluded, albeit without analysis, that constructive notice applied.

As we previously recognized, "some notice requirement is widely recognized and applied, including in modern-day cases." *Developers Diversified*, 415 F. App'x at 661 (citing Cause of Action Against Lessor for Failure to Repair or Maintain Leased Commercial Premises, 4 Causes of Action 2d 785 (2008); 49 Am.Jur.2d, Landlord and Tenant § 463; C.J.S. Landlord

& Tenant § 838.)[9]  We also observed that the "common-law notice requirement does not apply

where it conflicts with the express terms of the parties' contract." *Id.* at 663.  Here, the Lease is

silent regarding any notice requirement in relation to ¶¶14 and 17; thus, the Lease does not

conflict with the common-law rule requiring some notice.  As we previously stated, "'[w]here a

landlord is obligated to make repairs during the term, actual or constructive notice of the need for

repair is necessary to put the landlord in default on such obligation, *unless he or she agreed to*

*repair without notice*[.]'"  *Id.* at 662 (emphasis added) (quoting C.J.S. Landlord & Tenant

§ 836).  *See also Hines v. Wilcox*, 96 Tenn. 328, 34 S.W. 420, 421 (1896) (stating that although

the common-law rule "does not place upon the landlord the obligation of an insurer or warrantor

by contract," "[t]he tenant may have more extensive rights if she *expressly* contracts" for them)

(emphasis added).  Nothing in the instant Lease suggests that Service Hendon and SA intended

to abrogate the common-law notice rule or that Service Hendon "agreed to repair without

notice."[10]

Moreover, other sections of the Lease contain provisions specifically dispensing with any

notice requirement.  *See, e.g.*, Lease ¶12(B) ("Notwithstanding the foregoing, Landlord's failure

to satisfy the requirements of Article 12.A. (vi) hereof, *shall not be subject to any notice and*

---

[9] *See also Delatte v. S. Mark Realty Partners, Ltd.*, No. 01A01-9504-CV-00141, 1996 WL 17148, at *3 (Tenn. Ct. App. Jan. 19, 1996) (holding that, in the context of a negligence claim pursued by a tenant against his landlord, "[l]iability does not ensue until the landlord has notice, actual or constructive, and a reasonable opportunity to repair the defect").

[10] *Cf. Gordon v. Williams*, 986 S.W.2d 470, 473 (Mo. Ct. App. 1998) (finding that the parties waived a common-law notice requirement because the commercial lease *expressly* provided that tenants waive any notice requirements before landlords could bring action to repossess leasehold)

*cure period* as provided in Article 12.B. (ii)[.]") (emphasis added); Lease ¶12(C) ("In the event the Date of Occupancy occurs and Landlord shall violate any of the representations, warranties or covenants contained in this Lease, including Article 12 hereof, or fail to fulfill any of the covenants contained in this Lease during the Lease Term, Tenant shall *immediately (and without any additional notice or cure period)* pay Substitute Rent, in arrears by the fifth of each month for the Gross Sales of the prior month and in addition *(without any notice or cure period)* have the option of . . . .") (emphases added); Lease ¶16 ("If the utility service is interrupted due to the default or negligence of Landlord, its agents or employees, there shall be a prorated abatement of Annual Minimum Rental and all other charges payable by Tenant pursuant to this Lease based on the amount of time and area deemed nonfunctional by Tenant (*such abatement to occur without any notice and cure period*).") (emphasis added). These provisions indicate that, under some circumstances, the original contracting parties intended to deviate from the rule requiring a "notice and cure period." Neither Lease ¶14 nor ¶17 contains similar language modifying the otherwise applicable common-law rule.

Thus, we conclude that the original parties to the Lease did not intend to modify the common-law rule requiring at least constructive notice as a prerequisite to liability for breach of duties under the Lease. As such, the district court did not err as a matter of law when it applied constructive notice to the Lease provisions at issue.

**2.**

Tokio next argues that even if constructive notice[11] was a necessary precondition, the district court clearly erred in concluding that DD did not have such notice. We disagree.

Tokio's expert, Fitts, admitted that a visual inspection of the roof and drainage system would not have alerted anyone to a Code violation or a roof defect. Bruce Reed, another Tokio expert, was unable to point to any specific defect or Code violation that "the world's best [pre-assumption-of-lease] inspection" would have uncovered. (R. 378, PID 7131-38.) The district court also accurately observed that "[n]othing in the roof inspection reports . . . , including for an inspection performed just one week before the May 5, 2003 collapse, mentioned or alerted [DD] to any significant problem with either the roof or its drainage system, let alone any possible danger of an imminent partial roof collapse." (R. 407, PID 8014.) Further, citing DD's expert's deposition, the district court noted that "[a]bsent destructive testing, [DD] did everything it reasonably could to inspect and maintain the roof drainage system." (R. 407, PID 8050 (citing Pistrui Dep., Appellee's App'x, Vol. XVII, at 3219-20).) Dickey also opined that the purported weak connection of the joist girder to the wall was a latent construction error that could only be ascertained by destructive testing and not by ordinary inspection.

---

[11] In Tennessee, constructive notice is "information or knowledge of a fact imputed by law to a person (although he may not actually have it), because he could have discovered the fact by proper diligence, and his situation was such as to cast upon him the duty of inquiring into it." *Kirby v. Macon County*, 892 S.W.2d 403, 409 (Tenn. 1994) (quoting BLACK'S LAW DICTIONARY 1062 (6th Ed. 1990)). "[C]onstructive notice can be established by proving that the dangerous condition existed for a sufficient length of time that the premises owner, by exercising due care, should have discovered the dangerous condition." *Williams v. Linkscorp Tenn. Six, LLC*, 212 S.W.3d 293, 296 (Tenn. Ct. App. 2006) (citing *Simmons v. Sears, Roebuck & Co.*, 713 S.W.2d 640, 641-42 (Tenn. 1986)).

Tokio argues, however, that the facts compel a conclusion that DD had constructive notice of the missing concrete cap. Tokio maintains that had the building been properly constructed with a concrete rather than a masonry cap,

> the concrete cap would have extended from the rear wall's interior face to its exterior face; would have been made of concrete, which is smooth and thus distinguishable from the surrounding masonry blocks; would have been 10" x 10", rather than 8" x 16", the standard size of a masonry block; would have been visible from ground level; and – having not been installed – would have put [DD] on inquiry notice to determine whether any other potential problems may have existed where the relevant joist girder connected to the relevant masonry column.

(Appellant's Br. at 11-12 (citing Dickey's trial testimony).)

Tokio's argument fails. To be sure, Dickey admitted that a concrete cap does not "have the same face as a masonry block," (R. 381, PID 7470), and drew a rectangle on a photograph exhibit to indicate where the concrete cap would have been. However, neither Dickey nor any of Tokio's experts opined whether the difference between a 10" x 10" cap and an 8" x 16" cap atop the masonry columns on the underside of the roof would have been noticeable upon reasonable inspection from any vantage point. The answer is not apparent from the photographic exhibit on which Dickey drew, and Dickey opined that reviewing the original design and any "post-construction as-built work . . . done in the building" would not have revealed any construction errors. (R. 380, PID 7339.) Further, Tokio offered no evidence to support its theory that DD had constructive notice of the missing cap. This is not surprising given that Tokio maintained at trial that "the missing Concrete Cap played no causative role in the collapse." (Appellant's Br. at 44.)

In sum, we cannot conclude that the district court clearly erred when it held that "Tokio has not shown by a preponderance of the evidence that DD ha[d] constructive notice of any defective condition," (R. 407 PID 8052), because the district court's finding is "plausible in light of the record viewed in its entirety." *Anderson*, 470 U.S. at 573-74.

## IV.  CONCLUSION

Accordingly, we AFFIRM the judgment of the district court.